# In the United States Court of Federal Claims

GARRETT ELECTRONICS, INC.,

          Plaintiff,

          v.

THE UNITED STATES,

          Defendant,

          and

CEIA USA, LTD.,

          Intervenor-Defendant.

No. 22-cv-807

Filed Under Seal: December 19, 2022

Publication: January 10, 2023[1]

---

*Thomas Parker McLish*, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C. argued for Plaintiff. With him on the briefs are *Scott M. Heimberg*, *Samantha J. Block*, and *Madeline M. Bardi*, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C.

*Domenique Grace Kirchner*, United States Department of Justice, Civil Division, Washington, D.C. argued for Defendant. With her on the briefs are *Brian M. Boynton*, Acting Assistant Attorney General, Civil Division; *Patricia M. McCarthy*, Director, Commercial Litigation; *Deborah A. Bynum*, Assistant Director, Commercial Litigation; *Eric J. Singley*, Trial Counsel, Commercial Litigation; and *H. Weston Miller*, United States Department of Homeland Security, Office of the General Counsel.

*Aaron Scott Ralph*, Pillsbury Winthrop Shaw Pittman LLP, Los Angeles, CA argued for Intervenor-Defendant. With him on the briefs is *Jason D. Wright*, Curtis, Mallet-Prevost, Colt & Mosle LLP, New York, NY.

---

[1] This Memorandum and Order was filed under seal in accordance with the Protective Order entered in this case (ECF No. 10) and was publicly reissued after incorporating all redactions proposed by the parties. (ECF No. 39.) The sealed and public versions of this Memorandum and Order are otherwise identical, except for the publication date and this footnote.

## <u>MEMORANDUM AND ORDER</u>

This bid protest arises out of the Federal Protective Service's (FPS's) efforts to procure walk through metal detectors for federal buildings. Originating as six "night watchmen" hired in 1790 to guard buildings occupied by the then-fledgling federal government, the FPS is now responsible for protecting more than 9,000 federal facilities located throughout the United States and its territories.[2]  The FPS deploys metal detectors in federal buildings as its first line of defense against hazards and threats. *See* Administrative Record (ECF No. 19) (AR) at 3.  In 2021, the FPS requested vendors submit quotes to supply, deliver, install, and provide warranty services for walk through metal detectors over a five-year period. *See* AR at 77.

Plaintiff Garrett Electronics, Inc. (Garrett) unsuccessfully bid on the FPS contract.  Garrett now challenges the FPS's decision to award the contract to Intervenor-Defendant CEIA USA, Ltd. (CEIA).  In its Complaint, Garrett alleges "FPS's actions with respect to this procurement were arbitrary, capricious, and without rational basis."  Complaint (ECF No. 1) (Compl.) ¶ 2.  Garrett further argues the FPS "misapplied the evaluation criteria" and conducted "a flawed best value analysis," leading the FPS "to pay a ▮▮▮ price premium over Garrett's price." *Id.*  Garrett requests this Court (1) enter judgment in its favor, (2) order an injunction prohibiting the FPS from proceeding with the award to CEIA, and (3) order the FPS to reevaluate the bids, conduct a new best value analysis, and make a new award. *Id.* at 16.[3]

---

[2] *Who We Are*, Federal Protective Service, https://www.dhs.gov/who-we-are (last visited Dec. 2, 2022).

[3] Citations throughout this Memorandum and Order to the Administrative Record correspond to the pagination within the document.  Citations to all other documents, including briefing and exhibits, reference the ECF-assigned page numbers, which do not always correspond to the pagination within the document.

In September 2022, the parties filed their respective motions for judgment on the administrative record, and those motions are now fully briefed.  *See* Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 20) (Pl.'s MJAR); Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 22) (Def.'s Cross-MJAR); Intervenor-Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 23) (Int.'s Cross-MJAR).  On November 15, 2022, the Court also conducted oral argument on the parties' motions.  *See* Transcript of Oral Argument, dated Nov. 15, 2022 (ECF No. 35) (Oral Arg. Tr.).

Having considered the parties' arguments, applicable law, and the Administrative Record, the Court rules in favor of Defendant and Intervenor-Defendant.  Accordingly, for the reasons explained below, the Court **DENIES** Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 20) and **GRANTS** Defendant's and Intervenor-Defendant's Cross-Motions for Judgment on the Administrative Record (ECF Nos. 22, 23).  Defendant United States (Government), including the Department of Homeland Security and the FPS, is authorized to proceed with its award to CEIA.

## BACKGROUND

I.     **The Parties**

Garrett is a small business headquartered in Texas that manufactures, installs, and services walk through metal detectors for domestic and international customers.  Pl.'s MJAR at 8.  According to Garrett, it has furnished walk through metal detectors for a variety of facilities and events, including the Olympics and the 2018 FIFA World Cup in Russia.  *Id.* at 9.

CEIA is an Ohio-based company that "specializes in the design, production and maintenance support of metal detectors and electromagnetic inspection devices."  Int.'s Cross-MJAR at 5; AR at 649–50.  According to CEIA, it previously furnished and serviced metal

detectors for the FPS, including under a prior project with a scope that is "almost identical" to the solicitation at issue here.  AR at 997.  CEIA is "the incumbent FPS Contractor for [walk through metal detectors]."  AR at 24; *see also* AR at 25, 36, 1000, 1022.

The FPS is a component of the Department of Homeland Security.  Def.'s Cross-MJAR at 10.  The FPS "provides integrated security and law enforcement services in support of federally owned and leased facilities," including facilities outside the continental United States.[4]  The FPS uses walk through metal detectors to physically screen individuals entering the approximately 9,000 federal facilities under its protection.  *Id.*

## II.   The Solicitation

In November 2020, the FPS sought to "continue the upgrade of its Walk Through Metal Detector (WTMD) program."  AR at 3.  To advance this objective, the FPS issued a Request for Quotations (Solicitation) in April 2021, seeking offers to "purchase, deliver, install and provide warranty service for new WTMDs . . . for FPS sites within the Continental United States (CONUS) and outside the Continental United States (OCONUS)."  AR at 77.  The FPS planned to award a Blanket Purchase Agreement (BPA or Contract) for the purchase of metal detectors, with a one-year base ordering period followed by four one-year optional ordering periods.  AR at 16.  The Solicitation specified the Government would conduct the acquisition "in accordance with FAR 12 and 13.5 procedures."  AR at 9.

The Solicitation explained the Contract would "be issued to the vendor that provides the best value."  AR at 13; AR at 105.  Offeror's quotes would be evaluated based on price and three technical evaluation factors: Past Performance, Technical Approach, and Management Approach,

---

[4] *Who We Are*, Federal Protective Service, https://www.dhs.gov/who-we-are (last visited Dec. 2, 2022).

listed in "descending order of importance." *Id.* Each technical evaluation factor would be given an adjectival rating of Highly Acceptable, Acceptable, or Unacceptable. AR at 13–14. The Solicitation further stated that, when combined, the three technical evaluation factors "are significantly more important than price." AR at 105.

On May 24, 2021, the Solicitation closed, and the FPS received bids from three vendors: Garrett, CEIA, and ████████████████████████████. *See generally* AR at 226–99 (Garrett's Initial Quote); AR at 300–439 (CEIA's Initial Quote); AR at 440–79 (██████████ Initial Quote). While evaluating the bids, however, the contracting officer noticed fundamental errors and ambiguities in the Solicitation and determined an award could not be made. AR at 499–500. The contracting officer opted to issue a post-award amendment — Amendment 0007 — and provide Garrett, CEIA, and ████████ the opportunity to re-submit their proposals. *Id.*

### III.  **Amendment 0007**

The FPS issued Amendment 0007 to the Solicitation on November 15, 2021. AR at 200. The contracting officer sent Amendment 0007 to Garrett, CEIA, and ████████ and requested that each offeror "correct and resubmit" their respective quotes based on Amendment 0007's updated instructions. AR at 200; *see* AR at 212–20 (Correspondence with Garrett); AR at 221–24 (Correspondence with CEIA); AR at 225 (Correspondence with ████████). The contracting officer also sent each offeror a brief letter summarizing any issues found in that offeror's respective initial bid. *See* AR at 615–16 (Letter to Garrett); AR at 617–18 (Letter to CEIA); AR at 619–21 (Letter to ████████).

Amendment 0007 did not dramatically alter the Solicitation's evaluation framework. Like the original Solicitation, the FPS would still evaluate each quote based on price and the three technical evaluation factors: Technical Approach, Past Performance, and Management Approach.

AR at 200–05.  Amendment 0007 changed technical evaluation factor #1, Technical Approach, to a "pass or fail" factor.  AR at 202.  A passing Technical Approach received an "Acceptable" rating, and a failing Technical Approach received an "Unacceptable" rating.  *Id*.  Technical evaluation factors #2, Past Performance, and #3, Management Approach, remained largely unchanged and were "listed in descending order of importance."  *Id*.  When combined, Past Performance and Management Approach were considered significantly more important than price.  *Id*.  Amendment 0007 required each offeror resubmit its quote relating to factors #1 and #3, Technical Approach and Management Approach.  AR at 200, 204.  While offerors were not required to resubmit quotes for factor #2, Past Performance, Amendment 0007 allowed offerors to resubmit their Past Performance submission if they so chose.  AR at 203–04.

Price and the three technical evaluation factors, in their final forms, are discussed below.

### A.    Technical Evaluation Factor #1: Technical Approach

Amendment 0007 altered the Technical Approach factor to "a pass or fail factor," and each offeror would be rated Acceptable or Unacceptable for this factor.  AR at 202.  An Acceptable rating reflects that the quote meets the "minimum technical specifications;" an Unacceptable rating reflects that the quote lacks "one or more of the technical specifications."  *Id*.  Amendment 0007 required each offeror to submit a "Technical Approach Attestation," indicating whether the offeror's quoted walk through metal detector satisfied each of the requisite technical specifications. *Id*.; *see* AR at 206–11.  Amendment 0007 further stated that "[n]o other documents / pages will be accepted for this factor."  AR at 202.  The Technical Approach Attestation is simply a spreadsheet that lists one technical specification in each row.  If an offeror's quoted metal detector satisfied the technical specification, the offeror was required to check the corresponding "Compliant" column; if the metal detector did not satisfy the technical specification, the offeror was required to

check the corresponding "Non-Compliant" column.   An example of an Amendment 0007 Technical Approach Attestation is depicted below.  *See* AR at 206.

| Technical Approach Attestation (AR at 206) | | | |
|---|---|---|---|
| **Attachment 2 - Technical Approach** <br><br> **Vendor:** <br> **Proposed Machine:** | | | |
| | Minimum Requirement | Compliant | Non-Compliant |
| Weapons Detection | | | |
| | WTMDs must detect at a minimum, the items listed below, singularly and in any multi-weapon combination and disassembled (as largest metallic component) concealed anywhere on the body in any orientation at normal walk-through speeds (0.5 to 1.3 meters/sec), at all walking positions through the archway, and with any gait at a minimum detection rate of 95 % (at a 90% confidence level). | | |
| | Guns listed in Appendix B; Knives, Razor Blades, Scissors, Swords, and other metal-based weapons and objects. | | |
| | WTMDs must be capable of detecting the weapons in Appendix B (or similar) disassembled.  WTMDs must be capable of detecting disassembled gun(s) (.22 cal. or .32 cal.) and knife with 2 ½ inch blade independent of its magnetic flux density state as purchased, used in testing, firing or intentionally degaussed. | | |

### B.    Technical Evaluation Factor #2: Past Performance

As Technical Factors #2 (Past Performance) and #3 (Management Approach) were numbered in "descending order of importance" under the Solicitation, Past Performance was accordingly considered more important than Management Approach.  AR at 202.  Amendment 0007 required all offerors to "demonstrate relevant past performance" to the quoted job.  *Id.* Amendment 0007 defined relevant past performance as performance under prior projects (current or within the last three years) "that is of a similar or directly related scope, magnitude, and complexity" to the Solicitation.[5]   AR at 203.   The Solicitation further stated that such Past

---

[5] The FPS's Technical Evaluation Team (TET) "set benchmarks" for its evaluation of the scope, magnitude, and complexity of past projects.  *See* AR at 721.  The TET evaluated the relevancy of a past project's scope "by the type of product or service provided" on past projects, e.g., whether the referenced past project related to the delivery and installation of walk through metal detectors as required by the Solicitation.  *Id.*  The TET evaluated the relevancy of a past project's magnitude

Performance information would "assist the Government in determining the degree of risk associated with" each offeror, based on each offeror's proven capability to execute projects of similar scope, magnitude, and complexity to the contemplated Contract.  AR at 203.

Each offeror was required to submit at most three past projects for evaluation.  *See* AR at 203.  For each past project, a Past Performance Questionnaire (Attachment 5) was sent to an offeror's customers "to provide feedback" on each past project.  *Id.*; *see* AR at 136–40 (Past Performance Questionnaire).  Amendment 0007 acknowledges that an offeror's past projects could encompass performance by third parties, such as subcontractors.  AR at 203.  In that situation, the Government may evaluate the subcontractors' performance "separately and consider its findings about [the subcontractor] . . . when determining the risk associated with the quote and [in] assigning the appropriate rating to the quote."  *Id.*  Furthermore, Amendment 0007 noted that "[t]he Government may decide not to attribute to the prime contractor, as an organization, the past performance of its" subcontractors.  *Id.*

## C.    Technical Evaluation Factor #3: Management Approach

Under the Management Approach factor, each offeror was required to "provide management strategies and proposed solutions demonstrating how they will result in better value to the government."  AR at 204.  Given the operational needs of the FPS, including the need for functional metal detectors on a 24/7 basis, offerors were required to demonstrate how they would prevent disruptions relating to metal detector malfunction or servicing requirements.  *Id.*

---

"by considering various measures such as . . . the quantity of [walk through metal detectors] delivered in a year and or the annual purchase amount."  *Id.*  The TET evaluated the relevancy of a project's complexity "by considering various measures such as . . . the experience in delivery, installation, training, warranty coverage and annual maintenance of [walk through metal detectors] in geographically dispersed locations in CONUS and OCONUS locations."  AR at 722.  No party challenged the propriety of the TET's benchmarks.

Amendment 0007 elaborated that the Management Approach factor was an opportunity for each offeror to demonstrate the value its management strategies would bring to the FPS.  *See id.* (Management Approach "is where the benefits of the vendor and not only the equipment will be determined.").  Amendment 0007 required that, at a minimum, each submitted quote discuss the offeror's proposed warranty and maintenance plan; methods and procedures the offeror would use to ensure completion of deliveries in a timely manner; and the offeror's approach to manage the quality and timeliness of any response to the Government's requests and concerns during Contract performance.  *Id.*

**D.    Price Factor**

Amendment 0007 required that offerors' quotes include unit prices and extended prices; the Amendment stated the extended price is the unit price multiplied by the not-to-exceed quantity listed in the Solicitation.  AR at 204.  Like the original evaluation framework, under Amendment 0007, "Technical Factors #2 and 3 . . . when combined, are [still considered] significantly more important than price."  AR at 202.

**IV.    <u>First Technical Evaluation</u>**

On November 22, 2021, the three original offerors — Garrett, CEIA, and ▮▮▮▮▮▮▮ — submitted revised quotes in response to Amendment 0007.[6]  *See* AR at 622–37 (Garrett's Amendment 0007 quote); AR at 638–88 (CEIA's Amendment 0007 quote); AR at 689–716 (▮▮▮▮▮▮ Amendment 0007 quote).  The TET then evaluated and rated each Amendment 0007 quote.  AR at 717–38.

---

[6] An offeror's quote, submitted in response to Amendment 0007, is referenced as the offeror's "Amendment 0007 quote."

## A.     Evaluation of Garrett's Amendment 0007 Quote

The TET determined that under Technical Factor #1, Technical Approach, Garrett fully completed the Technical Approach Attestation, demonstrating its quoted metal detector, the Garrett PD6500i, satisfied the Solicitation's technical requirements.  AR at 722; *see generally* AR at 627–37.  Accordingly, the TET rated Garrett's Technical Approach Acceptable.  AR at 722.

Garrett provided three past projects for evaluation under Technical Factor #2, Past Performance.  AR at 722.  Garrett's first project involved its manufacture and delivery of ▇ walk through metal detectors for use at the ▇▇▇▇▇▇▇▇▇.  AR at 722–23.  Garrett's second project consisted of the manufacture, delivery, installation, and training regarding ▇ walk through metal detectors across ten locations within the United States, including Puerto Rico.  *Id.* Garrett's third project comprised the manufacture and installation of ▇ walk through metal detectors at the ▇▇▇▇▇▇▇▇▇▇.  *Id.*  Garrett used subcontractors for portions of the work in its past projects; however, despite that Amendment 0007 permitted "teaming arrangements" with subcontractors, Garrett did not propose using subcontractors in its Amendment 0007 quote.  *See* AR at 203; AR at 723–25.

Each Past Performance Questionnaire completed by Garrett's customers on the noted three projects reflected that Garrett's past performance on those jobs was "Highly Acceptable."  AR at 723–24.  The TET further concluded the scope and magnitude of Garrett's three past projects were "relevant" to the Solicitation.  AR at 723–25.  However, in assessing complexity, the TET determined that Garrett's first project (▇▇▇▇▇) was not relevant and third project (▇▇▇▇ ▇▇▇▇) was only partially relevant.  *Id.*  Specifically, the TET found that Garrett's first and third projects ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇.  *Id.*  Regarding Garrett's first project (furnishing walk through metal detectors for

the ███████████████████ ), the TET determined "there is limited information regarding actual life maintenance of the machines."   AR at 724.   By way of background, Garrett ████ ███████████████████████████████████████████████████████████

████ . *Id.*  The TET found relevant to the complexity determination that █████████████████ ███████████████████████████████████████████████████████████

*Id.*   In summary, in making its complexity determination, the TET found that the information Garrett provided regarding its ██████████████████████████████████████████ ████████████████████████  *Id.*  In assessing Garrett's third project, in which Garrett provided and installed metal detectors ████████████████████████████ ███████████████████████████████████████████████████████████

███████████████████████████████████  *Id.*  Additionally, the TET found relevant to its complexity determination that this past job ████████████████████████████████ ███████████████████████████████████████████████████████████

██████████████████  *Id.*; *see also* AR at 77 (FPS utilizes walk through metal detectors "in all 50 states, the District of Columbia, and all U.S. Territories"); *id.* (scope of work includes servicing walk through metal detectors "within the Continental United States . . . and outside the Continental United States").

Finally, the TET stated that in assessing the complexity of Garrett's past performance, it "had some difficulty when identifying which portion of [the prior] work was performed by [subcontractors] and which work was accomplished by Garrett itself."  AR at 725.  The TET further noted that the various tasks required under the Solicitation, including "delivery, maintenance, training, warranties, [and handling] geographic dispersion . . . were not always identifiably met by" Garrett in its past projects.  *Id.*  Since Garrett did not propose using subcontractors for this

Contract, the TET determined it could not adequately confirm that Garrett could handle the complexity of the Contract at issue in the Solicitation.  *Id.*  The TET also noted that it could not locate CPARS[7] reports "for Garrett or any of [Garrett's] identified [subcontractors]" noted in Garrett's past performance submission.  *Id.*  The TET thus concluded "there is a risk associated with Garrett's past performance particularly when demonstrating similar complexity."  *Id.*  Accordingly, the TET rated Garrett's Past Performance as Acceptable.  *Id.*

In assessing Technical Factor #3, Management Approach, the TET found that Garrett's Amendment 0007 quote included "one significant weakness."  AR at 726.  The TET stated that Garrett did not detail the methods and procedures it would use to ensure deliveries would be completed and submitted in a timely manner.  *Id.*; *see* AR at 204 (Amendment 0007 stating vendors should "[a]t a minimum . . . [d]escribe methods and procedures . . . to ensure that deliveries are completed and submitted in a timely manner").  Although Garrett emphasized in its submission that it had sufficient inventory to fulfill deliveries, it did not describe the "procedural or logistical methods" it would use to ensure timely deliveries, which, the TET found, "poses [a] possible security risk to the government."  *Id.*  Despite the identification of this significant weakness, the TET nonetheless rated Garrett's Amendment 0007 quote's Management Approach as Acceptable. *Id.*

### B.     Evaluation of CEIA's Amendment 0007 Quote

In assessing CEIA's quote under Technical Factor #1, Technical Approach, the TET concluded CEIA fully completed the Technical Approach Attestation, demonstrating its quoted

---

[7] CPARS is the "Contractor Performance Assessment Reporting System."  CPARS contains past performance information for federal contractors and is a resource used by federal agencies when making award decisions.  *See Homepage*, CPARS, https://cpars.gov/index.htm (last visited Nov. 8, 2022).

metal detector satisfied the Solicitation's technical requirements.  AR at 726; *see generally* AR at 641–48.  Accordingly, the TET rated CEIA's Technical Approach as Acceptable.  AR at 727.

CEIA submitted three projects for review to satisfy Technical Factor #2, Past Performance.  AR at 727–29.  The TET found that all three projects were "fully relevant in regard to scope, magnitude, and complexity."  AR at 729.  In particular, the TET explained that CEIA's first project "represents [FPS's] most recent [contract] with CEIA and is the most directly relevant project, as the scope of service is almost identical to the instant requirement."  *Id.*  The past performance questionnaires for CEIA's projects demonstrated that CEIA's work was highly acceptable, and the TET located 16 additional CPARS evaluations rating CEIA's performance anywhere between Satisfactory to Exceptional.  AR at 733; AR at 729.  The TET rated CEIA's Past Performance as Highly Acceptable.  *See* AR at 729.

In assessing Technical Factor #3, Management Approach, the TET identified three strengths in CEIA's Management Approach that offered "benefits to the government."  AR at 731.  First, CEIA identified ███████████████████████████████ for specific aspects of the Contract.  *Id.*  Second, the TET found that CEIA had provided a thoughtful and detailed plan for ensuring ████████████.  *Id.*  CEIA's plan "demonstrated an understanding of risks that come along with management of large orders of machines which are geographically dispersed."  *Id.*  Third, CEIA included a ████████████████ that, according to the TET, "provided a clear description" of CEIA's proposed process for ████████████████████.  *Id.*  As a result of this detailed and transparent plan, the TET found that ████████████████████ ██████ is minimized . . . increasing the security of both the facility and its occupants."  *Id.*  Accordingly, the TET rated CEIA's Management Approach as Highly Acceptable.  *Id.*

C.    **Evaluation of** ███████ **Amendment 0007 Quote**

The TET rated ███████ Technical Approach and Management Approach factors as Unacceptable.  AR at 731–32. ███████ also did not submit any past projects for review; its Past Performance factor was rated Neutral.[8]  *Id.*

D.    **Summary of Ratings**

In summary, the TET determined that CEIA submitted the highest-rated technical quote. AR at 736.  The TET rated CEIA's Technical Approach as Acceptable, and its Past Performance and Management Approach as Highly Acceptable.  *Id.*  The TET found that CEIA's performance on the incumbent project demonstrated CEIA could manage the scope, magnitude, and complexity of the tasks required by the Solicitation.  AR at 729; AR at 733.  The TET also assigned three strengths to CEIA's Management Approach.  AR at 731; AR at 734.  In contrast, while the TET likewise rated Garrett's Technical Approach as Acceptable, it rated Garrett's Past Performance and Management Approach only as Acceptable, not Highly Acceptable.  AR at 736.  Regarding Past Performance, the TET noted that two of Garrett's submitted past projects did not fully meet the complexity of the Solicitation.  AR at 725; AR at 733–34.  Furthermore, the TET found that Garrett's Management Approach contained a "significant weakness," as Garrett did not explain how it would ensure timely deliveries.  AR at 734.  Finally, the TET rated ███████ quote as Unacceptable; ███████ was therefore deemed ineligible for award.  AR at 733.

The TET's ranking of the three Amendment 0007 quotes is summarized below, as well as each quote's proposed price.  *See* AR at 736; AR at 740.

---

[8] According to the TET, "[s]ince there is no relevant past performance associated with this vendor, a rating of Neutral was assigned.  No relevant performance record is identifiable upon which to base a meaningful performance risk prediction.  This is neither a favorable nor unfavorable rating." AR at 732.

| Ranking | Vendor | Technical Approach | Past Performance | Management Approach | Price |
|---------|--------|--------------------|------------------|---------------------|-------|
| 1 | CEIA | Acceptable | Highly Acceptable | Highly Acceptable | $5,395,130.00 |
| 2 | Garrett | Acceptable | Acceptable | Acceptable | ███████ |
| 3 | ████ | Unacceptable | Neutral | Unacceptable | ███████ |

## V.      First Award

While the TET was responsible for evaluating and rating the submitted quotes, it was not responsible for ultimately selecting the awardee.  That role fell to the contracting officer, who was the designated source selection official.  *See* AR at 747.[9]  The contracting officer reviewed the offerors' Amendment 0007 quotes along with the TET's Technical Evaluation Report.  *See* AR at 739–43.  Based on "the quotes and an assessment of the advantages and disadvantages associated with each," the contracting officer "determined that the quote submitted by [CEIA] provides the best overall value to the Government, price and non-price factors considered."  AR at 739.  Accordingly, the contracting officer decided the "award should be made to" CEIA (First Award).  *Id.*

With respect to Past Performance, the contracting officer reasoned that "CEIA is found to be superior to Garrett due to multiple factors," including:

> [S]uccessful performance on the most relevant contract compared to the instant requirement[,] demonstrating the most relevant past performance, more examples of fully relevant past performance as compared to Garrett, and more visibility of the vendors [sic] performance on the ancillary services provided as part of this instant requirement, to include maintenance, training, warranties, etc.

---

[9]  Accordingly, the terms "contracting officer" and "source selection official" are used synonymously within this Memorandum and Order.

AR at 741.  The contracting officer found that Garrett's Amendment 0007 quote thus demonstrated "significantly more performance risk to the government as compared to the performance risk associated with CEIA."  *Id.*  With respect to Management Approach, the contracting officer noted that CEIA's Amendment 0007 quote included three strengths, while Garrett's Amendment 0007 quote had no strengths and one significant weakness.  AR at 741.  Accordingly, the contracting officer concluded CEIA's Amendment 0007 quote was "significantly superior" on Management Approach.  AR at 742.

While CEIA's Amendment 0007 quote was superior to Garrett's, CEIA's quoted price was $5,395,130.00 — about ███████ more than Garrett's ██████████ quoted price.  AR at 742. This was equivalent to an approximately ███████ annual price premium over the life of the five-year Contract.  Due to the price differential, the contracting officer conducted "a price/technical tradeoff analysis to determine whether CEIA's quote provides non-price benefits that would justify paying the ███████ annual price premium associated with their quotation."  *Id.*  The contracting officer emphasized that "CEIA was determined to be superior in all aspects of their technical quote when compared to Garrett."  *Id.*  She further stated that CEIA's Amendment 0007 quote "demonstrates relevant and high-quality past performance," and its Management Approach "provides a level of technical superiority which is superior to any benefits associated with the selection of the lower price quote of Garrett, which included a significant weakness and overall lack of detail and specificity."  *Id.*

The contracting officer further reasoned that "[s]pecifically differentiating CEIA's quote from Garrett's quote was an overall understanding of the complexity of the [Solicitation's] requirements;" this understanding was "suggestive of experience with risks associated with downtime or lapse in working WTMD."  AR at 742.  The contracting officer stressed that

functioning metal detectors are crucial to the FPS's mission, and "[s]ecurity breaches or lapses," including those resulting from metal detector downtime, "could be catastrophic." *Id.* In contrast to CEIA's comprehensive quote, the contracting officer found Garrett's "lack of detail" in its Management Approach risked ███████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████ AR at 743. The contracting officer concluded "there is significantly less performance risk associated with CEIA's technically superior quote, which more than offsets the ████████ annual price premium." *Id.*

On February 4, 2022, the contracting officer issued a notice of award to CEIA. *See* AR at 777. The contracting officer also informed Garrett and ██████████ of her decision to award the Contract to CEIA. *See* AR at 845–50. Garrett subsequently requested an explanation of the FPS's decision. AR at 857–59. On February 10, 2022, the contracting officer prepared for Garrett a brief explanation of award letter. *See* AR at 851–53. The contracting officer explained that regarding Past Performance, Garrett's first and third projects "did not fully meet complexity" and were therefore only "partially relevant." AR at 852. The contracting officer also informed Garrett that its Management Approach contained a significant weakness. *Id.* Overall, the contracting officer explained that CEIA's quote provided better value, as it was "technically superior" to Garrett's quote and was worth the ████████ price premium. *Id.*

## VI.      **GAO Protest and Subsequent Corrective Action**

On February 14, 2022, Garrett filed a pre-award protest at the GAO. AR at 882. Garrett's protest rested on two grounds. First, Garrett argued the FPS departed from the Solicitation's evaluation criteria. AR at 890–91. Garrett eventually withdrew this argument. AR at 909.

Second, Garrett argued the FPS's best value analysis was flawed — namely, that the FPS had no logical rationale for accepting the "enormous price premium" of CEIA's proposal.  AR at 891–93.

In response to the GAO protest, the contracting officer drafted an Agency Report.  *See* AR at 933.  While preparing the Agency Report, the contracting officer determined "corrective action was necessary and in the best interest to the government" because CEIA's Amendment 0007 quote "had missing information that may have precluded them from award."  *Id.*  Pursuant to that determination, the TET "re-evaluated all three quotations as their corrective action."  *Id.*; *see* AR at 918–33.

The TET "affirmed there [were] no changes in [its] assessment" of Garrett's and ███████ Amendment 0007 quotes.  AR at 923–24; AR at 926–27.  The TET likewise affirmed no changes in its assessment of the Past Performance and Management Approach portions of CEIA's Amendment 0007 quote.  AR at 925–26.  However, the TET concluded that due to an "administrative oversight," its initial assessment of CEIA's Technical Approach was flawed.  AR at 925.  Specifically, the TET stated that CEIA's Amendment 0007 quote "did not reflect that [CEIA's] machine met all minimum specifications" because CEIA's Technical Approach Attestation "missed two mandatory attestation[] sections."  *Id.*  In other words, CEIA had apparently made a clerical error and had failed to indicate compliance with two technical specifications listed in the Technical Approach Attestation.  *Id.*  This stood in contrast to CEIA's original submission, which had certified that CEIA's walk through metal detectors complied with the Solicitation's technical requirements.  *See* AR at 412–33; Oral Arg. Tr. at 62:22–64:15 (CEIA's counsel explaining "in the first proposal . . . CEIA . . . affirm[ed] that it was able to meet [the Solicitation's] technical requirements"); *see also infra* note 17.  It was also inconsistent with CEIA's other representations contained in its Amendment 0007 quote, which certified its proposed

equipment was "fully compliant with all specified requirements."  AR at 640.  Accordingly, because CEIA did not properly complete the Technical Approach Attestation form when it submitted its Amendment 0007 quote, the TET changed CEIA's Technical Approach Rating from Acceptable to Unacceptable.  *Id.*  The TET also affirmed that "any strengths, weaknesses, and/or deficiencies" in the three Amendment 0007 quotes, including Garrett's significant weakness, "remained unchanged" after the TET's re-evaluation of the quotes.  *Id.* at 934.  The TET's updated rankings after the re-evaluation are as follows (*see* AR at 927–28):

| Ranking | Vendor | Technical Approach | Past Performance | Management Approach | Price |
|---------|--------|--------------------|------------------|---------------------|-------|
| 1 | Garrett | Acceptable | Acceptable | Acceptable | ████████ |
| 2 | CEIA | Unacceptable | Highly Acceptable | Highly Acceptable | $5,395,130.00 |
| 3 | ██████ | Unacceptable | Neutral | Unacceptable | ██████ |

Instead of awarding the contract to Garrett, the contracting officer, as the source selection officer, subsequently determined further corrective action was necessary.  AR at 933.  "Based on [the TET's] re-evaluation . . . additional communications with the vendors and revised quotes are necessary."  AR at 934.  She stated that "[c]ommunication will be released to [CEIA] and [Garrett] to correct, update and/or improve their existing proposals."[10]  *Id.*  Furthermore, "[i]nformation will be provided to each . . . on any weaknesses or deficiencies" found in their respective proposals.  *Id.*  CEIA and Garrett would also have the opportunity to update or revise their proposed prices.  *Id.*  The FPS would then evaluate CEIA's and Garrett's updated proposals and issue a new award,

---

[10] The contracting officer excluded ██████ from further consideration.  *See* AR at 934.  Despite that it already had an opportunity to correct its proposal, ██████ "was unable to strengthen [its] proposal."  *Id.*  The contracting officer further explained that the "level of performance risk associated with [██████] proposal is so significant that it is unlikely the proposal would result in satisfactory contract performance."  *Id.*

if necessary, or maintain the First Award to CEIA.[11]  *Id.*  The contracting officer was clear, however, that exchanges between the FPS and the offerors were not "discussions" and were "not to be construed or interpreted under the provisions of FAR 15.3."  *Id.*  The contracting officer likewise stated that she reserved the right to "conduct communication with one, some, none or all vendors at its discretion."  *Id.*

On April 22, 2022, the contracting officer sent letters to Garrett and CEIA, informing them of the FPS's planned, additional corrective action.  AR at 935–51.  The contracting officer requested that Garrett and CEIA provide updated proposals and explained each offeror "may . . . re-submit some or all of your quotation."  AR at 935, 946.  The contracting officer also provided specific feedback to Garrett and CEIA, respectively, about the most prominent issues in their former quotes.  In her letter to CEIA, the contracting officer noted CEIA's deficient Technical Approach Attestation, flagging that CEIA did not indicate compliance with the Operational Availability and Test Functions technical requirements.  AR at 946–47.  The contracting officer also noted to Garrett the "significant weakness" in Garrett's Management Approach.  AR at 935.  Specifically, Garrett was informed that its Amendment 0007 quote concerning Management Approach did not sufficiently "lay out procedural or logistical methods" to ensure deliveries will be fulfilled in a timely manner.  AR at 935–36.

In a follow-up question to the contracting officer, Garrett noted prior feedback from the FPS, particularly the FPS's February 10, 2022 explanation letter, "indicated that 'greater complexity' is desired with past performance" and queried "what specific criteria points of complexity are evaluators seeking as the standards for complexity?"  AR at 944.  The contracting

---

[11]  In view of the FPS's additional corrective action, the GAO dismissed Garrett's protest as academic.  *See* AR at 911.

officer reiterated the instruction in the Solicitation that "the scope, magnitude, and complexity of a vendor's past performance projects/contracts are compared to the requirements of the current solicitation." *Id.* The contracting officer further cautioned, "[it] is the vendor's responsibility to carefully review the current solicitation requirements and submit past performance projects/contracts that most closely align with the scope, magnitude, and complexity of the instant requirement." *Id.*

## VII.     <u>Second Technical Evaluation</u>

CEIA and Garrett submitted updated quotes on April 27, 2022 and May 11, 2022, respectively.[12] *See* AR at 952–67 (Garrett's final quote); AR at 968–81 (CEIA's final quote). The TET again evaluated the updated quotes.

### A.     TET Evaluation of Garrett's Final Quote

In its final quote, Garrett updated its Technical Approach, demonstrating again that its walk through metal detectors satisfied the Solicitation's technical requirements.[13] *See* AR at 987–88. The TET thus rated Garrett's Technical Approach as Acceptable. *Id.* Garrett did not update the Past Performance portion of its quote; accordingly, the TET made no changes to its assessment of Garrett's Past Performance and maintained Garrett's rating of Acceptable. AR at 988–91.

In response to the significant weakness identified by the contracting officer in Garrett's Amendment 0007 quote, Garrett updated its Management Approach in its final quote to address the noted weakness. AR at 987; AR at 991–94. Upon its re-evaluation, the TET identified a

---

[12] The Court references offerors' updated, post-corrective action quotes as the offerors' "final quotes." Each final quote consists of both the offeror's updates submitted in response to the FPS's additional corrective action, along with any sections of the offeror's Amendment 0007 quote that were not updated in response to the additional corrective action. *See* AR 987, 994.

[13] Garrett's Amendment 0007 Technical Approach had previously passed as Acceptable. *See* AR at 722.

strength in Garrett's updated Management Approach, but also identified two weaknesses and one area of concern.  AR at 993–94.  The first weakness identified in Garrett's final quote included Garrett's stated goal to limit metal detector downtime to 24–96 hours in CONUS locations and 96–168 hours in OCONUS locations.  AR at 993; *see also* AR 952–59.  The Solicitation, however, mandated downtime of no more than three business days (72 hours).  *See* AR at 90.  The second weakness identified in Garrett's final quote was an ambiguity regarding Garrett's service requests and operating hours.  In response to a service request, Garrett assured that a technician would respond within an hour during normal business hours, ████████████████████████████ ███████████████  AR at 994.  The Solicitation, however, defined "normal business hours" as 8 a.m. to 4:30 p.m. *locally*; it did not state a particular time zone when defining "normal business hours."  *Id.*  The TET interpreted Garrett's statement as an indication that there would be times within "normal business hours," as defined in the Solicitation, when coverage would not be available under Garrett's proposal.  *Id.*  For example, 8 a.m. EDT is 7 a.m. CDT, which, according to the TET, was not within "normal business hours," as defined in Garrett's proposal.  *Id.*  The TET also expressed concern with Garrett's personnel bandwidth to provide adequate service.  AR at 993–94.  Garrett employed ██████████████████ "who will travel and cover technical phone support."  AR at 956.  The TET expressed concern that ███████████ could be insufficient to "provide all technical phone support as well as deliveries, installations, [and] trainings."  AR at 993–94.  Finally, the TET identified one strength in Garrett's updated Management Approach, namely the number of units Garrett was able to produce in a short amount of time to quickly replace aging metal detectors.  AR at 994.

Accordingly, the TET gave Garrett's Management Approach in its final quote the same rating it previously gave Garrett — Acceptable.  AR at 993–94.

**B.       TET Evaluation of CEIA's Final Quote**

CEIA's final quote updated only the Technical Approach portion of its prior quote; the TET therefore maintained its evaluations of CEIA's previous Past Performance and Management Approach submissions, which were both rated as Highly Acceptable.  AR at 994.  CEIA's final quote corrected the prior administrative deficiency in CEIA's Technical Approach, as identified by the contracting officer.  *Id.*  CEIA completed the Technical Approach Attestation, indicating its metal detectors met the Solicitation's technical requirements.  AR at 994.  Its Technical Approach, as stated in its final quote, was deemed Acceptable.  *Id.*

**C.       Summary of the TET's Updated Ratings**

The TET's ratings and ranking of Garrett's and CEIA's final quotes were identical to its previous ratings and rankings.  CEIA's Past Performance was rated Highly Acceptable.  AR at 1000.  The TET specifically noted CEIA's performance on an incumbent project, which was "highly acceptable or exceptional in all areas" and involved "almost identical tasks" as those associated with the Solicitation.  *Id.*  CEIA's Management Approach was likewise rated Highly Acceptable, with three identified strengths: *first*, CEIA's ███████████████ involved in performing the Contract; *second*, CEIA's "thoughtful and detailed" approach for ████████ ██████ ; and *third*, CEIA's ███████████████ , which was detailed and "provided a clear description of processes and accountability."  AR at 1001.  In contrast, Garrett opted not to update its Past Performance submission, despite receiving an Acceptable rating during the prior evaluation.  *See* AR at 987.  Nor did Garrett update its submission regarding the two projects the TET had identified as lacking complexity in comparison to performance required by the Solicitation.  *Id.*; *see also* AR at 1000–01.  Garrett could have provided more detail or swapped out the past project examples, but did not.  AR at 935 (contracting officer authorizing Garrett to

"re-submit some or all of [its] quotation"). While Garrett updated its Management Approach submission, the TET still identified two weaknesses and a concern in Garrett's updated submission, as well as a single strength. AR at 1001–02. Specifically, the TET identified Garrett's proposed normal business hours and metal detector downtime as weaknesses and further identified Garrett's limited support personnel as an area of concern. AR at 1002. The TET identified Garrett's capacity to produce units in a short time frame as the sole strength in Garrett's Management Approach. *Id.* In sum, the TET determined "CEIA's proposal is considered technically superior to [Garrett's]." *Id.* The TET's ranking of the two updated, final quotes is summarized below, as well as the updated price for each quote. *See* AR at 1002–03, 1009.

| Ranking | Vendor | Technical Approach | Past Performance | Management Approach | Price[14] |
|---------|--------|--------------------|------------------|---------------------|-----------|
| 1 | CEIA | Acceptable | Highly Acceptable | Highly Acceptable | $5,395,130.00 |
| 2 | Garrett | Acceptable | Acceptable | Acceptable | ███████ |

**VIII.**      **Final Award**

The same source selection authority, here the contracting officer, again reviewed Garrett's and CEIA's final quotes, including revised pricing, as well as the TET's updated Technical Evaluation Report. AR at 1019. The contracting officer concluded "the quote submitted by [CEIA] provides the best overall value to the Government." *Id.* As Garrett and CEIA's Past Performance submissions did not change since the contracting officer's First Award, her corresponding analysis therefore remained the same. The contracting officer found CEIA's quote "superior to [Garrett's] due to multiple factors," including successful performance on the

---

[14] As noted *infra* Discussion Section I.B.iv, Garrett also increased its price in its final quote, while CEIA resubmitted the same price in its final quote. The differential between the updated prices of the two offerors was approximately ████████, or about ███████ per year of the Contract's five year term.

incumbent contract; more examples of fully relevant past performance; and more visibility of CEIA's performance on ███████████ such as ████████████████████ AR at 1021.  The contracting officer also compared CEIA's Management Approach — with three demonstrated strengths — to Garrett's updated Management Approach — with only one strength, two weaknesses, and a concern — and concluded that "CEIA's quote is . . . superior."  AR at 1021–22.  CEIA's final quote, therefore, remained technically superior to Garrett's final quote.

The contracting officer also evaluated price prior to making an award.  Specifically, the contracting officer reasoned that because CEIA's price — which was unchanged after the corrective action — was still greater than Garrett's slightly increased price, she needed to conduct a "price/technical tradeoff analysis to determine whether CEIA's quote provide[d] non-price benefits that would justify paying the ████████ annual price premium associated with [CEIA's] quotation."  AR at 1022.  The contracting officer reasoned that her price/technical tradeoff analysis demonstrated that CEIA's final quote offered a "better value to the Government."  *Id.*  Specifically, she found that CEIA's quote "demonstrate[d] relevant and high-quality past performance as well as an effective, comprehensive, and detailed Management Approach plan."  *Id.*  The contracting officer emphasized that CEIA's quote demonstrated comfort with the level of complexity required by the Solicitation and demonstrated CEIA's ability to manage metal detectors across geographically dispersed locations.  AR at 1023.  Given the importance of metal detectors to the FPS mission, the contracting officer found that CEIA's "technically superior" quote offered "less performance risk" than Garrett's quote and "more than offsets the ████████ annual price premium."  *Id.*  In contrast, the contracting officer emphasized that Garrett's ████████ ████████ cast doubt on Garrett's ability to manage the complexity of the Solicitation.  *Id.* Additionally, the contracting officer noted that Garrett's "timeframes associated with replacement

machines was the largest concern identified by the TET," which, in the contracting officer's view, demonstrated Garrett "may not understand the critical nature of [metal detector downtime] under the FPS['s] instant requirement."  *Id.*

Accordingly, the contracting officer determined that CEIA offered the best value and accordingly awarded the Contract to CEIA (Final Award).  AR at 1019, 1023.

IX.     **Procedural History**

Garrett filed this bid protest on July 25, 2022, approximately three weeks after the FPS made its Final Award of the Contract to CEIA.  *See* Compl.  The Government agreed to "stay all performance on the [C]ontract at issue until" December 9, 2022, and the parties agreed to a briefing schedule.  *See* Aug. 1, 2022 Joint Status Report (ECF No. 12) at 1; Nov. 7, 2022 Status Report (ECF No. 30) at 1.  Garrett filed its Motion for Judgment on the Administrative Record on September 2, 2022, and the Government and CEIA cross-moved for Judgment on the Administrative Record on September 23, 2022.  *See* Pl.'s MJAR; Def.'s Cross-MJAR; Int.'s Cross-MJAR.  On November 15, 2022, this Court conducted oral argument on the parties' three MJARs.  *See* Oral Arg. Tr.

**APPLICABLE LEGAL STANDARD**

This Court reviews post-award bid protests in two steps.  First, the Court analyzes the procurement under the Administrative Procedure Act (APA).  28 U.S.C. § 1491(b)(4); *Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021) (citing *XOtech, LLC v. United States*, 950 F.3d 1376, 1380 (Fed. Cir. 2020)).  Second, the Court analyzes whether the alleged errors prejudiced the protestor.  *See DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005)).

Turning to the first step, the APA requires a reviewing court to determine "whether the agency's actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Off. Design Grp. v. United States*, 951 F.3d 1366, 1371 (Fed. Cir. 2020) (quoting *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013)); 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706.  Although the inquiry under the APA "is to be searching and careful, the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  Accordingly, courts may set aside an award only if "(1) 'the procurement official's decision lacked a rational basis' or (2) 'the procurement procedure involved a violation of regulation or procedure.'" *DynCorp*, 10 F.4th at 1308 (quoting *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020)).

When a protestor alleges the agency's decision — including a decision to implement corrective action — lacked a rational basis, the court reviews "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004)).  As the United States Court of Appeals for the Federal Circuit (Federal Circuit) has explained, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Contruzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  Indeed, agency decisions are "entitled to a presumption of regularity." *Impresa*, 238 F.3d at 1338 (citing *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626–27 (1986)).  Protestors bear a similar burden when alleging that the procurement involved legal or procedural violations, as the court reviews such claims for "a clear . . . violation

of applicable statutes or regulations." *Id.* at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

At the second step, regardless of whether the alleged error relates to irrational conduct or a violation of law, the protestor must establish that the agency's conduct prejudiced the protestor. *See Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 996–97 (Fed. Cir. 2021) (citing *Shinseki v. Sanders*, 556 U.S. 396, 406–07 (2009)). This is a factual question for which the protestor must "show 'that there was a "substantial chance" it would have received the contract award but for' the [alleged error]." *Id.* at 998 (quoting *Bannum*, 404 F.3d at 1353). "*De minimis* errors in the procurement process [generally] do not justify relief." *Off. Design Grp.*, 951 F.3d at 1374 (alteration added).

If a protestor meets its burden of demonstrating that the procurement both violated the APA and prejudiced the protestor, declaratory or injunctive relief may be appropriate. *See* 28 U.S.C. § 1491(b)(2). However, successful protestors are not automatically entitled to an injunction. *See Centech Grp.*, 554 F.3d at 1037. Before entering injunctive relief, "the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Id.* (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)).

The Rules of the United States Court of Federal Claims (Rules) provide the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum*, 404 F.3d at 1356. Parties initiate such proceedings by filing motions for judgment on the administrative record. Rule 52.1(c). In adjudicating such motions under Rule 52.1, courts resolve questions of

fact by relying on the administrative record.  *Bannum*, 404 F.3d at 1356.  If necessary, a court may remand the case to a governmental agency for further factual findings.  *See generally* Rule 52.2.

## DISCUSSION

Garrett argues the FPS's conduct in administering the Solicitation and in making the Final Award was arbitrary and capricious in two respects.  The first relates to the FPS's decision to take additional corrective action after re-evaluating the offerors' Amendment 0007 quotes in response to Garrett's GAO protest.  Garrett claims the FPS's additional corrective action was an unreasonable and transparent attempt to award the contract to its preferred vendor, CEIA.  *See* Pl.'s MJAR at 24–26.  Garrett also alleges the FPS implemented the corrective action unfairly, favoring CEIA over Garrett and thereby giving CEIA a competitive advantage.  *Id.* at 26–29. Garrett's second principal argument targets the FPS's evaluation and ratings of Garrett's and CEIA's final quotes.  Specifically, Garrett argues the FPS's evaluation and rating of Garrett's final quote on Past Performance and Management Approach were arbitrary and capricious.  *Id.* at 29–32.  Garrett also contends the FPS's decision to award the Contract to CEIA, despite CEIA's higher price, was unreasonable and the result of a flawed best value analysis.  *Id.* at 32–33.

This Court disagrees.  Garrett has not met its "heavy burden" of proving the FPS's administration of the Solicitation was arbitrary and capricious.  *Centech Grp.*, 554 F.3d at 1037. Accordingly, and for the reasons discussed in greater detail below, this Court must deny Garrett's MJAR and grant the Government's and CEIA's Cross-MJARs.

I.    **The FPS's Decision to Take Additional Corrective Action and Subsequent Implementation of the Additional Corrective Action Was Rational and Not Arbitrary and Capricious**

Garrett presents two complaints regarding the FPS's additional corrective action.  *First*, when the FPS realized it made a mistake in its initial evaluation of CEIA's Amendment 0007

quote, the FPS took additional corrective action by seeking revised quotes from both Garrett and CEIA.  *See* AR at 933–34.  Garrett argues the FPS's chosen corrective action was unreasonable. Pl.'s MJAR at 24–26.  In Garrett's view, the FPS "could have and should have awarded the contract to Garrett."  *Id.* at 6; *see also id.* at 25.  Instead, Garrett contends that the FPS "decided to manipulate the process in an effort to retroactively justify its award to CEIA."  *Id.* at 6–7.

*Second*, Garrett asserts the FPS compounded its allegedly arbitrary and capricious error by implementing the additional corrective action unfairly.  *Id.* at 7.  Garrett claims the FPS "spoon-fed CEIA the information it needed to fix its non-compliant proposal, while giving Garrett only vague suggestions as to how to improve its proposal."  *Id.*  The FPS's favoritism, Garrett argues, improperly provided CEIA with a competitive advantage.  *Id.*  Furthermore, Garrett alleges CEIA was unfairly advantaged because it believes CEIA learned of Garrett's lower price before submitting its final quote.  *Id.*

The Government and CEIA counter that the FPS's additional corrective action was reasonable.  Def.'s Cross-MJAR at 25–26; Int.'s Cross-MJAR at 10–12.  The Government characterizes Garrett's complaints as a "mere disagreement" with the FPS's chosen additional corrective action, which "does not establish a legal basis to conclude that FPS's corrective action was unreasonable."  *Id.* at 30.  Furthermore, the Government stresses that the FPS treated CEIA and Garrett fairly while implementing the additional corrective action.  *Id.* at 33–37.  The Government argues that the FPS conducted equal communications with both CEIA and Garrett, informing each of the single glaring problem with each offeror's Amendment 0007 quote.  *Id.* CEIA further contends it "never learned Garrett's proposal price" until Garrett filed this bid protest.  Int.'s Cross-MJAR at 14.

30

For the reasons set forth below, this Court agrees with the Government and CEIA. The FPS had a rational basis to implement additional corrective action. Consistent with the broad discretion granted to agencies in implementing corrective action, this Court finds the FPS's decision to take additional corrective action was not arbitrary and capricious. This Court further finds the FPS treated Garrett and CEIA fairly during the additional corrective action.

### A. The FPS Had a Rational Basis to Implement Additional Corrective Action

The FPS had a rational basis to implement additional corrective action by soliciting updated quotes from CEIA and Garrett. Garrett's argument to the contrary is, fundamentally, a disagreement with the FPS's chosen additional corrective action, and is based on an improper standard of review of agency corrective action. Accordingly, Garrett's arguments are unpersuasive.

### i. Garrett's Proposed Standard for Reviewing Agency Corrective Actions Is Contrary to Federal Circuit Precedent

Garrett argues "[t]he only appropriate corrective action was for FPS to rescind the improper award to CEIA and award the contract to Garrett as the only offeror who had submitted a compliant and acceptable proposal." Pl.'s MJAR at 25; *see also id.* at 25–26 ("The only appropriate way to remedy the Agency's impropriety of awarding the contract to an ineligible offeror is to reevaluate the properly submitted proposals and make a new award to the next-in-line offeror."). Garrett would have this Court limit the FPS's universe of potential corrective action to a single option: re-evaluate Garrett's and CEIA's Amendment 0007 quotes and award the Contract to "the next-in-line technically acceptable" offeror, Garrett. Pl.'s Reply at 8–9. Garrett's argument, however, is foreclosed by Federal Circuit precedent affirming agencies' broad discretion in pursuing corrective action.

The Federal Circuit recently reinforced the principle that courts should review agency "corrective actions under the APA's 'highly deferential' 'rational basis' standard." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (citing *Croman Corp. v. United States*, 724 F.3d 1357, 1363 (Fed. Cir. 2013)).  The facts in *Dell Federal* closely align with those of the present action.  In response to a GAO protest by unsuccessful offerors challenging the Army's award of a computer hardware contract, the Army decided to take corrective action.  *Id.* at 986–89.  The corrective action entailed (1) opening discussions with all offerors, (2) requesting final revised proposals, and (3) issuing a new award decision.  *Id.* at 988.  The initial awardees filed suit in the Court of Federal Claims "seeking to enjoin the Army's corrective action."  *Id.* at 989.  The Court of Federal Claims agreed with the initial awardees, concluding "a reasonable 'corrective action must narrowly target the defects it is intended to remedy.'"  *Id.* at 991 (citing *Dell Fed. Sys.*, 133 Fed. Cl. at 104).  The court enjoined the Army's corrective action "because it felt there was 'a more narrowly targeted post-award solution that the Army entirely failed to consider.'"  *Id.* (citing *Dell Fed.*, 133 Fed. Cl. at 105).

The Federal Circuit reversed, emphasizing it had "never adopted [the lower court's] heightened, 'narrowly targeted' standard."  *Dell Fed.*, 906 F.3d at 992, 999.  Instead, "corrective action only requires a rational basis for its implementation."  *Id.* at 991.  "The rational basis test asks 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'"  *Id.* at 992 (citing *Banknote Corp.*, 365 F.3d at 1351).  The Federal Circuit found that "[t]he Army's proposed corrective action to reopen procurement and allow proposals to be revised is rationally related to the procurement's defects."  *Id.* at 995.  "The Army was not legally required to address every option, but rather to provide a reasonable corrective action and adequately explain its reasoning for doing so."  *Id.* at 998.  The Federal Circuit accordingly held

the Army "rationally decided to ameliorate a defective solicitation" by holding discussions and permitting offerors to submit final revised proposals. *Id.*

*Dell Federal* cautioned against "an overly stringent test for corrective action." *Id.* at 993. Yet, that is precisely the test Garrett argues in its brief this Court should apply to the FPS's decision to implement additional corrective action. *See* Pl.'s MJAR at 24–26; *but see* Oral Arg. Tr. at 11:21–22. All parties agree that the FPS had initially erred when it evaluated CEIA's Amendment 0007 quote, which "had missing information" — specifically, no indication of compliance with two technical specifications — "that may have precluded them from award." AR at 933. The procurement therefore had a defect: the FPS had awarded the Contract to an Unacceptable offeror. *Id.* The contracting officer subsequently determined "corrective action was necessary," to include "re-evaluation" of the Amendment 0007 quotes and "additional communications with the vendors and revised quotes." AR at 933–34. Under Garrett's reasoning, this Court should limit the FPS to a single permissible corrective action: re-evaluation of Garrett's and CEIA's Amendment 0007 quotes and issuance of a new award to the next-in-line offeror. *See* Pl.'s MJAR at 25–26 (characterizing reevaluation and award to Garrett as "[t]he *only* appropriate corrective action" and "[t]he *only* appropriate way to remedy" the FPS's error) (emphasis added). This is precisely the type of "overly stringent test" the Federal Circuit jettisoned in *Dell Federal*. The Federal Circuit unequivocally rejected any requirement that agency corrective action must "narrowly target" the procurement defects. *Dell Fed.*, 906 F.3d at 991–92. A ruling for Garrett would essentially confine the FPS to the narrowest corrective action possible to cure the procurement's defect. Such a decision, where the *only* rational corrective action is simply the *narrowest* possible corrective action, is contrary to law and was expressly rejected by the Federal Circuit in *Dell Federal*.

Garrett's flawed understanding of the standard of review for agency corrective action is demonstrated by its reliance on pre-*Dell Federal* jurisprudence, most of which applied the now-repudiated "narrowly targeted" test to agency corrective actions.[15]  For instance, Garrett repeatedly cites the Court of Federal Claims decision in *Amazon Web Servs., Inc. v. United States*, 113 Fed. Cl. 102 (2013).  *See* Pl.'s MJAR at 24; Pl.'s Reply at 7.  However, the court in *Amazon Web Services* applied the "narrowly targeted" test, stating that "any corrective action must narrowly target the defects it is intended to remedy." *Amazon Web Servs.*, 113 Fed. Cl. at 115; *see also id.* at 116 (holding agency's corrective action irrational because "it was not narrowly tailored to address discrete procurement defects").  Indeed, the Federal Circuit in *Dell Federal* faulted the trial court for its "improper reliance" on the "defective legal standard" recited in *Amazon Web Services*.  *Dell Fed.*, 906 F.3d at 993.

Similarly, Garrett relies heavily on the Court of Federal Claims decisions in *Sheridan Corp. v. United States*, 95 Fed. Cl. 141 (2010), and *WHR Grp., Inc. v. United States*, 115 Fed. Cl. 386 (2014).  *See* Pl.'s MJAR at 24, 25, 28 (citing *Sheridan*); Pl.'s Reply at 7, 8, 10 (citing *Sheridan*); *id.* at 7, 10 (citing *WHR Group*).  But both *Sheridan* and *WHR Group* also applied the overly stringent "narrowly targeted" test.  The court in *Sheridan* announced that, "[s]imply put, the corrective action must target the identified defect."  *Sheridan*, 95 Fed. Cl. at 153.  The court in *WHR Group*, relying on *Sheridan*, enjoined the agency's corrective action because a "readily available, more narrowly-tailored remedy" existed.  *WHR Grp.*, 115 Fed. Cl. at 400 (applying *Sheridan*'s "targeting test" to agency corrective action).

---

[15] Tellingly, Garrett's briefs never reference, cite, or acknowledge *Dell Federal*.  *See* Pl.'s MJAR; Pl.'s Reply.

Accordingly, the FPS's corrective action need not be "narrowly targeted" to address the procurement's defects.   That the FPS could have addressed its errant award to a technically Unacceptable offeror by simply re-evaluating Garrett's and CEIA's quotes does not mean the FPS was *required* to do so; this Court will not "substitute [its] judgment" for the agency's "by determining whether there was another, perhaps preferable solution."   *Dell Fed.*, 906 F.3d at 999 (quoting *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)). Accordingly, pursuant to *Dell Federal*, an agency's corrective action need only be supported by a rational basis.

ii.   Applying the Proper Standard, the FPS Had a Rational Basis to Take
     Additional Corrective Action

The rational basis test asks "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."   *Dell Fed.*, 906 F.3d at 992 (quoting *Banknote Corp.*, 365 F.3d at 1351).   Agency corrective action will be sustained if "rationally justified" by the grounds relied on to take corrective action.   *Raytheon Co. v. United States*, 809 F.3d 590, 595 (Fed. Cir. 2015); *see also Croman Corp.*, 724 F.3d at 1367 (upholding agency's corrective action because it was "rationally based").   Review under the rational basis standard is "highly deferential" and requires "a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."   *Adv. Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).   Corrective action must be "reasonable under the circumstances."   *PAE Applied Techs., LLC v. United States*, 154 Fed. Cl. 490, 510–11 (2021) (quoting *Superior Optical Labs, Inc. v. United States*, 152 Fed. Cl. 319, 322–23 (2021)).

The FPS's additional corrective action — communicating with CEIA and Garrett and evaluating revised quotes — was reasonable and supported by a rational basis.   The FPS's initial

corrective action entailed re-evaluating CEIA's and Garrett's Amendment 0007 quotes.  *See* AR at 918–34.  That re-evaluation uncovered that "CEIA's Technical Approach should have been rated Unacceptable" because "CEIA failed to fill in two blocks of their [Technical Approach Attestation], neither confirming their technical approach meets the specifications nor affirming that they are non-compliant or why."  AR at 933.  The re-evaluation also "affirmed that the remaining evaluation under all factors for all three vendors, to include any strengths, weaknesses and/or deficiencies" — including Garrett's significant weakness — "remained unchanged."  AR at 934.  "Based on [the] re-evaluation," the contracting officer "determined additional communications with the vendors and revised quotes [were] necessary."  *Id.*

The contracting officer made a rational decision that addressed the procurement defect.  CEIA's mistake was a clerical error; CEIA simply failed to indicate compliance for two technical requirements.  *See* AR at 641–48; *see also infra* note 17.  Nonetheless, this clerical error rendered CEIA's Amendment 0007 quote, while "significantly superior" to Garrett's, ineligible for award.  AR at 742; *see also* AR at 202 (Technical Approach is "pass or fail").  Garrett's quote, on the other hand, was technically eligible for award but included a "significant weakness" in its Management Approach.  *See* AR at 725–26; AR at 741–42.  Amendment 0007 required that offerors to "**[a]t a minimum** . . . **discuss**" "any methods and procedures that the contractor will use to ensure that deliveries are completed and submitted in a timely manner to the Government, including deliveries to OCONUS locations."  AR at 204 (emphasis in original).  The TET determined Garrett's Amendment 0007 quote did not adequately address this topic; Garrett simply stated it "will utilize [its] current internal order system . . . with no additional explanation."  AR at 726.  This was considered "a significant weakness" because Garrett's "internal ordering system was not detailed, which pose[d] possible risk . . . and could leave FPS sites without the necessary machines to meet

the FPS protection mission." *Id.*  The TET found Garrett's lack of detail demonstrated that Garrett "underestimated the complexity of managing the contract." *Id.*  The contracting officer agreed, stating that what "[s]pecifically differentiat[ed] CEIA's quote from Garrett's quote was an overall understanding of the complexity of the requirements." AR at 742.  Garrett's "lack of detail and planning for timely completion of deliveries and installations was a concern" to the contracting officer and, in her view, "may cause risk of downtime at Federal Buildings." AR at 743.  Because "[s]ecurity breaches or lapses could be catastrophic," the contracting officer concluded there was "significantly less performance risk associated with CEIA's technically superior quote." AR at 742–43.

Left with these options — CEIA's superior quote with a clerical error and Garrett's inferior but technically acceptable quote with a significant weakness — the contracting officer reasonably concluded additional communication with CEIA and Garrett was necessary. *See* AR at 933–34. It was rational for the contracting officer to request improved quotes from CEIA and Garrett to obtain the best value for the government, particularly in light of the issues with CEIA's and Garrett's Amendment 0007 quotes. *See* AR at 205 (noting the award "will be issued to the vendor that provides the best value"); *Banknote Corp.*, 365 F.3d at 1355–56 ("It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value."); *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.").  Indeed, "agencies are 'allowed the discretion to review their own conclusions if they conclude a mistake has been made, or if further inquiry appears appropriate, provided the re-evaluation conforms with the solicitation.'" *Guardian Moving and Storage Co.,*

*Inc. v. United States*, 657 F. App'x 1018, 1023 (Fed. Cir. 2016) (quoting *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 105 Fed. Cl. 541, 569 (2012)).  As noted, after re-evaluation of the offerors' quotes, the FPS's initial award to CEIA was deemed defective.  The contracting officer operated well within her considerable discretion to (i) correct the defective award by permitting Garrett and CEIA to address the significant concerns with each quote, and (ii) make a new award based on Garrett's and CEIA's final quotes.[16]

While not binding, other Court of Federal Claims cases addressing similar corrective action are instructive.  In *ANHAM FZCO*, for example, the Court of Federal Claims, relying heavily on *Dell Federal*, held that the agency had a rational basis to implement corrective action that addressed broader problems beyond the discrete evaluation error necessitating corrective action. *ANHAM FZCO v. United States*, 149 Fed. Cl. 427, 435–38 (2020).  After an evaluation error in the procurement, the agency implemented corrective action to "allow limited revisions to proposals that are more than two years old in response to" changes to underlying prices and ground conditions; the court determined the agency's corrective action was supported by a rational basis. *Id.* at 437–38.  Garrett attempts to distinguish *ANHAM FZCO* by arguing the passage of time in *ANHAM FZCO* necessitated revised proposals, while no passage of time occurred in the present

---

[16] At oral argument, Garrett argued the FPS's additional corrective action lacked a rational basis because such action was not necessary to correct the procurement defect. *See, e.g.*, Oral Arg. Tr. at 14:13–20 (additional corrective action "was not necessary"), 14:17–18 ("Saying something is necessary when it's unnecessary is not rational."), 15:16–17 ("The contracting officer said it was necessary, and it was not necessary."), 19:6–20, 71:3–11.  Garrett's argument highlights the improper standard for agency corrective action.  As discussed above, agency corrective action is proper if it is supported by a rational basis.  The argument that corrective action must be "necessary" is simply a re-formulation of the "narrowly targeted" standard unequivocally rejected by the Federal Circuit in *Dell Federal*.  As noted *infra*, the contracting officer's decision that additional corrective action was necessary is supported by a rational basis and is therefore proper.

case.  *See* Pl.'s Reply at 9–10.  This distinction is unavailing; indeed, the outdated proposals in *ANHAM FZCO* are not unlike the Amendment 0007 quotes here.  All quotes contained serious deficiencies — outdated information in *ANHAM FZCO* and ineligible or problematic submissions in this case — and the agencies each took corrective actions to update the quotes and "improve the competitive process."  *ANHAM FZCO*, 149 Fed. Cl. at 436 (citing *Dell Fed.*, 906 F.3d at 986 n.1).  More importantly, *ANHAM FZCO* demonstrates the critical difference between the rational basis test and the pre-*Dell Federal* "narrowly targeted" test: an agency may have a rational basis to implement corrective action that is broader than simply addressing the discrete procurement defect.  For these reasons, the FPS, therefore, had a rational basis to implement additional corrective action.

### iii.   The FPS Was Not Limited to a Single Corrective Action

Garrett argues "[t]he only appropriate corrective action was for FPS to rescind the improper award to CEIA and award the contract to Garrett."  Pl.'s MJAR at 25.  As previously noted, Garrett's argument applies an improper, overly stringent standard of review for agency corrective action.  *See supra* Discussion Section I.A.i.  Tellingly, Garrett has not cited any authority holding that after finding a defect in a best value procurement, the government is required to make the award to the next-in-line offeror.  Indeed, while not binding, prior decisions from the Court of Federal Claims undermine Garrett's position.  In *EP Productions, Inc. v. United States*, for example, only one proposal met the "threshold" acceptability requirements, while all proposals — including the lone acceptable proposal — "contained deficiencies and weaknesses."  *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 224 (2005).  The contracting officer amended the threshold acceptability requirements so more offerors would be eligible for award; the offeror that had submitted the lone acceptable proposal protested, arguing it was entitled to award.  *Id.*  The court

disagreed, concluding "the rigid rule that plaintiff espouses here would leave the government at the mercy of a single contractor — even one that has deficiencies in its proposal — if, as a result of the application of certain mandatory requirements, every other competitor in a negotiated, best value procurement were initially disqualified." *Id.* at 225.

So too here; requiring that the FPS award the Contract to Garrett, despite the "significant weakness" in its quote, when the FPS had a rational basis to take additional corrective action, would be "illogical and finds no support in the law." *Id.; see also ManTech Telecomm. and Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 72 (2001) (holding that awardee's "failure to comply with the Solicitation did not oblige the Army to exclude its proposal, but, instead, provided a basis for further discussions and other steps to cure the identified defects"), *aff'd*, 30 F. App'x 995, 995 (Fed. Cir. 2002) (finding "no error in the thorough and well-reasoned decision of the Court of Federal Claims"); *Guardian Moving and Storage*, 657 F. App'x at 1023 (quoting *ManTech*'s conclusion that in a "negotiated procurement, [if] an offeror's proposal does not comply with the solicitation's requirements, an agency is not required to eliminate the awardee from the competition, but may permit it to correct its proposal") (alteration in original). Considering the contracting officer agreed with the TET that Garrett had failed to address "a minimum requirement of the Management Approach submittal," which could "cause risk of downtime at Federal Buildings," it was rational for the FPS to have addressed the significant weakness in Garrett's Amendment 0007 quote. AR at 742–43; *see also ManTech*, 49 Fed. Cl. at 80 (recognizing the discretion afforded to an agency in negotiated procurements involving both "highly technical requirements" and "national security concerns").

Yet, setting Garrett's flawed argument aside, Garrett is also incorrect that the "only appropriate" corrective action was for the FPS to award the Contract to Garrett. *See ManTech*, 49

Fed. Cl. at 79 ("[Protestor] is flatly wrong in arguing that the only appropriate 'corrective action' here is to award it the contract.").  The FPS had other courses of corrective action available to it, further demonstrating the reasonableness of its ultimate approach.  For example, Amendment 0007 stated the FPS may "communicate with vendors regarding their quotes and seek corrections."  AR at 205.  Amendment 0007 further stated the FPS "may conduct communications with one, some, none, or all vendors at its discretion."  *Id.*  Rather than undertaking additional corrective action, the FPS could simply have communicated with CEIA and requested a correction to CEIA's Technical Approach Attestation.  Indeed, Federal Acquisition Regulation (FAR) Part 15.306(a)(2) expressly permits that offerors "be given the opportunity to clarify certain aspects of proposals . . . or to resolve minor or clerical errors."  FAR 15.306(a)(2).  While the Solicitation was not conducted pursuant to FAR Part 15, the parties acknowledge FAR Part 15's framework, particularly relating to communications between the agency and offerors, is instructive.  *See* Oral Arg. Tr. at 29:8–15; Pl.'s MJAR at 27 n.5; Def.'s Cross-MJAR at 33 n.11, 35–36; *see also Centerra Grp., LLC v. United States*, 138 Fed. Cl. 407, 413 (2018) ("[T]he definitions of clarifications and discussions in FAR 15.306 are widely applied in a variety of procurement contexts."); *infra* Discussion Section I.B.  The FPS could have asked CEIA to correct the clerical error in its Technical Approach Attestation and confirm that its metal detectors comply with the Solicitation's technical requirements.[17]  Such a correction would have cured the procurement defect, as CEIA

---

[17] It is evident that the errors in CEIA's Technical Approach Attestation in its Amendment 0007 quote were clerical errors.  CEIA's first, pre-Amendment 0007 quote certified compliance with the very requirements CEIA neglected to certify in the Technical Attestation spreadsheet attached to its Amendment 0007 quote.  *Compare* AR at 414 (CEIA indicating compliance with "Operational Availability" requirement), *and* AR at 419 (CEIA indicating compliance with data/information processing and storing features), *with* AR at 642, *and* 646 (CEIA failing to indicate compliance with those same technical requirements in its Amendment 0007 quote's Technical Approach Attestation).

would have certified — as it did in its final quote — that its metal detectors do indeed comply with the Solicitation's technical requirements. *See* AR at 970–78. It also would have been reasonable for the FPS to clarify with CEIA, whose quote was "significantly superior" to Garrett's and carried "significantly less performance risk" than Garrett's, that its equipment complied with the Solicitation's technical requirements. AR at 742–43; s*ee DynCorp Int'l LLC v. United States*, 76 Fed. Cl. 528, 540 (2007) ("It was not unreasonable for the Air Force to seek information only from [awardee] to clarify aspects of [awardee's] proposal or to correct minor errors in [awardee's] proposal, if the Air Force planned, based on its evaluation of initial proposals, to award the contract to [awardee] without seeking revisions of either proposal."). It would be illogical to find that the FPS had a rational basis to seek clarifications from CEIA, yet nonetheless hold the FPS had no rational basis for the additional corrective action the FPS ultimately implemented, which permitted *both* CEIA *and* Garrett equal opportunity to update and improve their quotes.

---

Although *Dell Federal* suggests that defects relating to spreadsheet ambiguities, resulting in "submission of technically unacceptable offers," may indicate substantive errors, rather than clerical errors, this aspect of *Dell Federal* is distinguishable from the present case. *Dell Fed.*, 906 F.3d at 995. First, the spreadsheet ambiguities in *Dell Federal* were clearly substantive in nature and prevented offerors from "properly identify[ing]" which equipment the offeror had included in its proposal. *Id.* That is not the case here, as CEIA offered the same model metal detector in each of its quotes. *See* AR at 377, 412–32 (CEIA's initial quote offering 02PN20 metal detector); AR at 640 (CEIA's Amendment 0007 quote offering 02PN20 metal detector); AR at 970 (CEIA's final quote offering 02PN20 metal detector). Second, CEIA indicated its metal detectors complied with the Solicitation's technical requirements in parts of its submission other than in its Technical Approach Attestation. As noted, CEIA's initial, pre-Amendment 0007 quote indicated that its metal detectors complied with the Solicitation's technical requirements. *See* AR at 414, 419. Also, CEIA's Amendment 0007 quote certified its proposed metal detectors are "fully compliant with all specified requirements." AR at 640. In sum, CEIA simply failed to properly fill out two boxes in the Technical Approach Attestation, despite clearly stating elsewhere that its equipment was compliant. This is convincing evidence that CEIA's failure to complete the Technical Approach Attestation was a clerical error, not a substantive error.

iv.   The Agency's Reasoning is Reasonably Discernible

At oral argument, Garrett suggested the FPS did not provide a "coherent and reasonable explanation" of its decision to implement additional corrective action. Oral Arg. Tr. at 14:1–20, 76:23–77:16; *see Dell Fed.*, 906 F.3d at 992–94. This Court disagrees. As part of the re-evaluation of CEIA's and Garrett's Amendment 0007 quotes, the TET "affirmed that the remaining evaluation under all factors for all three vendors, to include any strengths, weaknesses and/or deficiencies remain unchanged." AR at 934. Critically, the TET's re-evaluation affirmed Garrett's Management Approach contained a significant weakness. AR at 924. The contracting officer then decided, "[b]ased on this re-evaluation," that additional corrective action was necessary. AR at 934. The contracting officer exercised her discretion to take corrective action based on CEIA's technically Unacceptable quote and Garrett's "lacking" proposal with a "significant weakness." AR at 741–43. This is a sufficiently "coherent and reasonable" explanation for the agency's decision to implement additional corrective action. This Court must "uphold a decision of less than ideal clarity if the agency's path may reasonably by discerned." *Bowman Transp.*, 419 U.S. at 285–86. "An explicit explanation" of an agency's decision "is not necessary . . . where the agency's decisional path is reasonably discernible." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998). Contrary to Garrett's argument, given "the individualized agency reasons for taking corrective action, the court's review must be based on the entire administrative record before the court." *Novak Birch, Inc. v. United States*, 132 Fed. Cl. 578, 602 (2017); *see also Harmonia Holdings Grp., LLC v. United States*, 160 Fed. Cl. 674, 687 n.7 (2022) (sufficient that "the record as a whole" allows the agency's path "to be 'reasonably discerned'") (quoting *SigNet Techs., Inc. v. United States*, 154 Fed. Cl. 396, 408 (2021)). The contracting officer and TET exhaustively documented the strengths and weaknesses of CEIA's and Garrett's

Amendment 0007 quotes. *See, e.g.*, AR at 717–57. The contracting officer and TET also explained the decision to take corrective action and the need for additional corrective action, as well as the precise steps the FPS would take in implementing the additional corrective action. *See, e.g.*, AR at 918–34. Based on the record, this Court concludes the "agency's decisional path is reasonably discernable." *Wheatland Tube*, 161 F.3d at 1369–70. In light of the procurement defect, the FPS opted to solicit updated proposals, permit CEIA and Garrett to fix significant issues in their Amendment 0007 quotes, and finally evaluate those offerors' updated, final quotes. The FPS had a sufficiently-documented rational basis for implementing additional corrective action.

v.   <u>No Evidence of Bad Faith</u>

Finally, while not explicit, Garrett's argument is tinged with accusations of bad faith on the part the FPS. Garrett accuses the FPS of "manipulat[ing] the process in an effort to retroactively justify its award to CEIA." Pl.'s MJAR at 6–7. Garrett claims the FPS's additional corrective action "was specifically tailored to allow CEIA a 'second bite at the apple.'" *Id.* at 24; *see also id.* at 25 ("FPS . . . decided to take corrective action under the guise that it was responding [to] Garrett's GAO protest . . . ."); Pl.'s Reply at 8 ("FPS made its corrective action decision under the guise of remedying FPS's evaluation errors when, in reality, it was nothing more than a tool for CEIA to correct its mistakes."). Garrett more or less accuses the FPS of putting its finger on the scale to ensure the award would go to CEIA.

It is well-established that there is a strong "presumption that government officials act in good faith." *Am-Pro Prot. Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002). Overcoming this presumption "requires 'well-nigh irrefragable proof'" that government officials did not act in good faith. *Croman Corp.*, 724 F.3d at 1364 (quoting *Kalvar Corp., Inc. v. United States*, 543 F.2d 1298, 1301 (Ct. Cl. 1976)). To the extent Garrett argues the FPS conducted the

Solicitation in bad faith, there is absolutely no evidence in the record to support this claim — nor does Garrett cite any evidence.  Nor will this Court infer bad faith.  Garrett appears to suggest the procurement's facts necessarily imply bad faith.  In other words, the FPS's decision to implement additional corrective action cannot be explained by anything other than bad faith.  As noted, however, the FPS had a rational basis to implement additional corrective action.  Garrett's gestures towards bad faith, with "no corroborating evidence," fall well short of the "well-nigh irrefragable" standard.  *Am-Pro Prot. Agency*, 281 F.3d at 1243.

### B.     The FPS Treated Garrett and CEIA Fairly When Implementing the Additional Corrective Action

Garrett next argues that even if the FPS's decision to take additional corrective action was proper, its implementation of the additional corrective action was unfair and "[p]rovided CEIA with an [u]nwarranted [c]ompetitive [a]dvantage."  Pl.'s MJAR at 26.  Garrett contends that the communications between the FPS and CEIA and Garrett, respectively, were unequal.  According to Garrett, the FPS "spoon-fed" CEIA everything CEIA needed to fix its quote but provided Garrett only "vague suggestions" about Garrett's own deficiencies.  *See* Pl.'s Reply at 11; *see generally* Pl.'s MJAR at 26–29.  To support its contention, Garrett points to the FPS's alleged failure to inform Garrett of the FPS's concern with Garrett's use of subcontractors on its Past Performance projects.  *See* Pl.'s MJAR at 26–28; Pl.'s Reply at 11–13; AR at 740; AR at 742–43.

Garrett's arguments are unpersuasive.  The FPS implemented the additional corrective action fairly.  The contracting officer determined, "[b]ased on [the] re-evaluation" of CEIA's and Garrett's Amendment 0007 quotes, that "additional communications with the vendors and revised quotes are necessary."  AR at 934.  The contracting officer also decided that "[c]ommunication will be released to [CEIA and Garrett] to correct, update and/or improve their existing proposals."

*Id.* This communication would include "[i]nformation . . . on any weaknesses or deficiencies found specific to their submitted proposals." *Id.*

The contracting officer then informed CEIA and Garrett of the glaring problem in each respective proposal. *See* AR at 935–36; AR at 946–47. The contracting officer informed Garrett of the "significant weakness" in Garrett's Management Approach. AR at 935. The contracting officer specified that "[w]hile Garrett's quote stated that it has sufficient inventory to fulfill the instant requirement, the quote did not lay out the procedural or logistical methods to ensure it will be accomplished in a timely manner." AR at 935–36. Garrett's quote reflected it would use its internal procedures, but "those internal procedures were not described in Garrett's quote." AR at 936. Likewise, the contracting officer informed CEIA its quote "did not confirm that its machine met all minimum specifications required in [the] Technical Approach Attestation," which "render[ed] [CEIA's] quotation Unacceptable." AR at 946 (emphasis omitted). The contracting officer flagged the two technical requirements at issue. AR at 946–47 (noting "blank mandatory attestation items" for "Operational Availability" and "Test Functions").

In sum, Garrett's argument questions whether the FPS conducted fair communications with Garrett and CEIA.

### i.    FAR Part 15, Though Not Binding, Is Instructive

A threshold issue is the standard this Court should apply. FAR Part 15 generally "prescribes policies and procedures" for negotiated acquisitions. FAR 15.000. Courts typically use the procedures outlined in FAR 15.3, particularly FAR 15.306, to analyze the propriety of communications between agencies and offerors. FAR 15.3 "prescribes policies and procedures for selection of a source or sources in competitive negotiated acquisitions;" and FAR 15.306 more specifically governs "exchanges with offerors after the receipt of proposals." *See* FAR 15.300,

15.306.  It is undisputed, however, that the Solicitation was not conducted pursuant to FAR Part 15.  *See, e.g.,* Oral Arg. Tr. at 29:8–15 (Garrett's acknowledgement that "the specific rules for FAR Part 15 procurements don't apply here").  Instead, the Solicitation was conducted "in accordance with FAR 12 and 13.5 procedures."  AR at 9.  Relevant here, FAR Part 13.5 "provides a procurement mechanism that reduces an agency's procedural requirements for reviewing . . . proposals."  *Colonna's Shipyard, Inc. v. United States*, 152 Fed. Cl. 631, 640 (2021).  The Solicitation was clear that "exchanges [occurring] pursuant to this acquisition . . . are not to be construed or interpreted under the provisions of FAR 15.3."  AR at 205.  The contracting officer similarly emphasized communications between it and the offerors "will not be considered discussions" under FAR 15.3.  AR at 935, 946.  This Court must therefore determine what standards apply to the FPS's communications with Garrett and CEIA.  *See* Pl.'s MJAR at 27 n.5 (acknowledging that the FPS "correspondence with the offerors notes that the discussions were not to be construed with the strict procedures of FAR Part 15"); Def.'s Cross-MJAR at 33 n.11 (noting "this procurement was conducted under FAR Part 13," not Part 15).

    Both parties agree that communications must be fair.  *See* FAR 1.102(b)(3) (agencies must conduct procurements "with integrity, fairness, and openness"); Pl.'s MJAR at 27 n.5 ("[T]he discussions still must be fair."); Def.'s Cross-MJAR at 33 n.11 ("The United States concurs with Garrett that these communications must still be fair.").  Both parties also cite approvingly to the Court of Federal Claims decision in *Centerra Group, LLC v. United States*, 138 Fed. Cl. 407 (2018).  *See* Pl.'s MJAR at 27 n.5; Def.'s Cross-MJAR at 33 n.11.  In *Centerra*, though the procurement was not conducted pursuant to FAR Part 15, the court explained that when "discussions" occur, "the overwhelming weight of authority is that the agency must conduct any future discussions in conformance with the fairness principles enshrined in FAR Part 15."

*Centerra Grp.*, 138 Fed. Cl. at 414.   Put differently, "although adherence to FAR Part 15 procedures is not required," it is permissible for the court to assess agency-offeror discussions using "the fairness principles enshrined in FAR Part 15." *Id.*  This Court agrees that approach is reasonable.   Given the parties' agreement that discussions must be fair; the parties' mutual endorsement of *Centerra*'s use of the "fairness principles enshrined in FAR Part 15;" and the parties' citations to case law applying FAR Part 15 principles, this Court will use FAR Part 15 principles to guide its evaluation of the FPS's communications with CEIA and Garrett.  *See, e.g.*, Pl.'s MJAR at 27 (citing *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653 (2010)); *id.* n.5 (citing *IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265 (2022)); Pl.'s Reply at 11 (citing *Precision Asset Mgmt. Corp. v. United States*, 135 Fed. Cl. 342 (2017)); Def.'s Cross-MJAR at 35–36 (applying FAR 15.306).

This Court emphasizes, however, that the FPS need not strictly abide by the procedures outlined in FAR Part 15.   The Solicitation was conducted in accordance with FAR 13.5, titled "Simplified Procedures for Certain Commercial Products and Commercial Services."  FAR 13.5.  The purpose of these simplified acquisition procedures "is to vest contracting officers with additional procedural discretion and flexibility" so that acquisitions may proceed "in a simplified manner that maximizes efficiency and economy and minimizes burden and administrative costs for both the Government and industry."  FAR 13.500(a).   Though the contracting officer is constrained by the requirement of fairness, FAR Part 13 nonetheless affords "discretion and flexibility" to contracting officers.  *See Seaborn Health Care, Inc. v. United States*, 55 Fed. Cl. 520, 526–27 (2003) ("[T]he emphasis under [FAR Part 13] is on flexibility and discretion, not formal requirements."); *see also Colonna's Shipyard*, 152 Fed. Cl. at 640 (FAR Part 13.5 "reduces an agency's procedural requirements for reviewing offerors' proposals"); *Dubinsky v. United*

*States*, 43 Fed. Cl. 243, 254 (1999) (noting, in *dicta*, that if "simplified procedures under Part 13" were used, "many of plaintiff's concerns about the conduct of discussions in this procurement would be irrelevant"). At a basic level, "[t]he simplified acquisition procedures in Part 13 allow contracting officers considerable flexibility in the contract award process." *Dubinsky*, 43 Fed. Cl. at 254. Therefore, though this Court intends to use jurisprudence regarding FAR Part 15 as a guide, this Court will not ignore the enhanced flexibility contracting officers receive in procurements under FAR Part 13.

ii.   The FPS's Communications Were Fair

FAR Part 15 indicates that communications, specifically discussions, between an agency and offerors must be fair and meaningful. *See, e.g.*, *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 715–17 (2011) (in the context of FAR Part 15, noting that agencies must "conduct meaningful discussions with all responsible offerors" that do not "favor one offeror over another") (internal citations and quotations omitted). "Meaningful discussions 'generally lead offerors into the areas of their proposals requiring amplification or correction.'" *Ceres Env't Servs., Inc. v. United States*, 97 Fed. Cl. 277, 309 (2011) (quoting *Adv. Data Concepts, Inc. v. United States*, 43 Fed. Cl. 410, 422 (1999)). Discussions should generally "address weaknesses or deficiencies in an offeror's proposal that, unless corrected, would preclude award." *Patriot Taxiway Indus., Inc. v. United States*, 98 Fed. Cl. 575, 587–88 (2011). However, there is "no requirement that all areas of a proposal which could have a competitive impact be addressed in discussions." *Dynacs Eng'g Co., Inc. v. United States*, 48 Fed. Cl. 124, 131 (2000). The government "need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others." *Acra, Inc. v. United States*, 44 Fed. Cl. 288, 295 (1999) (internal citations and quotations omitted).

As noted, the contracting officer emphasized the communications between herself and CEIA and Garrett should "not be considered discussions" subject to the stringent requirements outlined in FAR 15.3.  AR at 935, 946.  Nevertheless, the contracting officer's communications with CEIA and Garrett were meaningful and did not "favor one offeror over another." *CRAssociates*, 102 Fed. Cl. at 715–17 (internal citations and quotations omitted).  In her decision to take additional corrective action, the contracting officer stated that "[i]nformation . . . on any weaknesses or deficiencies" in CEIA's and Garrett's respective proposals would be communicated to each.  AR at 934.  That is precisely what the contracting officer did.  She informed CEIA of the omission in its Technical Approach Attestation, which rendered CEIA's quote Unacceptable.  *See* AR at 946–47.  She likewise informed Garrett of the "significant weakness" in its Management Approach.  *See* AR at 935–36.  The contracting officer was also equally descriptive of each offerors' weakness.  She highlighted the two technical specifications with which CEIA did not indicate compliance.  *See* AR at 946–47 (noting "two blank mandatory attestation items" Operational Availability under Line 25 and Test Functions under Line 52).  She also described to Garrett the significant weakness in its Management Approach, specifically Garrett's failure to (1) "lay out procedural or logistical methods to ensure" deliveries are completed and delivered in a timely manner, including to OCONUS locations, and (2) describe Garrett's "internal procedures" for ensuring timely delivery.  *See* AR at 935–36.  The contracting officer provided equal feedback to Garrett and CEIA.

Contrary to Garrett's allegation, the FPS did not provide only "vague suggestions as to how to improve [Garrett's] proposal."  Pl.'s Reply at 11.  The contracting officer described her concerns with Garrett's Management Approach and provided sufficient information for Garrett to improve this aspect of its quote.  Indeed, upon updating its quote, Garrett turned the "significant weakness"

portion of its quote into a strength.  *Compare* AR at 726 *with* AR at 991–94.  Whereas Garrett's Amendment 0007 quote "provided no information" regarding the FPS's delivery requirements, *see* AR at 726, Garrett's final quote adequately addressed Garrett's ability "to meet the initial delivery requirements on time" as well as "communication with the vendor, customer training and technical support after initial delivery as well as delivery of OCONUS destinations."  AR at 993. Garrett's updated quote also detailed Garrett's "extensive inventory" of metal detectors and its current "level of production above capacity in order to meet unusual urgent request[s] or large order[s] and surges in demand;" the TET found "[t]he number of units able to be produced in short time frames was a [sic] considered a strength."  AR at 992–93.  Garrett used the contracting officer's communication to radically improve its quote; it cannot now seriously contend the FPS offered only "vague suggestions" for improvement.  Pl.'s Reply at 11.  These facts support that the contracting officer treated CEIA and Garrett fairly during her communications with each offeror.

### iii.   Communication Concerning Garrett's Past Performance

Garrett's primary complaint with the FPS's communications relates to the Past Performance factor.  *See* Pl.'s MJAR at 27–28 ("Garrett should not be faulted for failing to clarify [the Past Performance] portion of its proposal that it was unaware needed clarifying."); Pl.'s Reply at 11 ("Following the [additional] corrective action, FPS . . . only alerted Garrett to its weakness in Management Approach — not Relevant Past Performance.").   Garrett claims the communications were unfair because the FPS did not inform Garrett of the concerns with Garrett's Past Performance, specifically Garrett's past use of subcontractors.  *See* Pl.'s MJAR at 27–28; Pl.'s Reply at 11–13.  This Court disagrees, for several reasons.

*First*, the FPS was not obligated to communicate to Garrett its apparent concerns with Garrett's prior use of subcontractors. The TET and contracting officer concluded Garrett's past projects did not fully meet the complexity of the Solicitation and were therefore only partially relevant. *See* AR at 722–25; AR at 740–41. They made such a conclusion because Garrett had used subcontractors for certain aspects of its submitted past projects, which made it difficult to identify "which portion of work was perform[ed] by subs and which work was accomplished by Garrett itself;" therefore, "much of the complexity of the [Solicitation]," such as "delivery, maintenance, training, warranties, [and] geographic dispersion," was "not always identifiably met by" Garrett. AR at 741.

Garrett demands too much from the contracting officer's communication. Even under FAR Part 15, there is "no requirement that all areas of a proposal which could have a competitive impact be addressed in discussions." *Dynacs Eng'g*, 48 Fed. Cl. at 131. Generally, only severe deficiencies that "would preclude award" should be addressed. *Patriot Taxiway Indus.*, 98 Fed. Cl. at 587–88. Garrett has not demonstrated that the agency's concerns with Garrett's Past Performance were preclusive of an award. For example, there was no "adverse past performance" that reflected poorly on the quality of Garrett's work; indeed, all three reviewers for Garrett's past projects deemed the quality Garrett's performance as "highly acceptable." *See* AR at 725; AR at 741; *see also* FAR 15.306(d)(3) (requiring contracting officer discuss "adverse past performance information" during discussions). Rather, Garrett's use of subcontractors made it difficult for the TET and contracting officer to confirm Garrett had experience completing projects of similar complexity. *See* AR at 725; AR at 740–43. There was, therefore, some "risk associated with Garrett's past performance particularly when demonstrating similar complexity." AR at 741–42. Furthermore, the TET did not characterize Garrett's Past Performance concerns as either a

deficiency or a weakness. *See* AR at 725 (TET not assigning weakness or deficiency to Garrett's Past Performance); AR at 740–42 (contracting officer concluding there was "less risk associated with" CEIA's Past Performance); *see also* FAR 15.306(d)(3) (requiring contracting officer discuss "deficiencies" and "significant weaknesses" during discussions). Overall, Garrett's Past Performance submission was only partially relevant to the Solicitation, but Garrett's Past Performance issues were neither deficiencies nor significant weaknesses necessitating discussion by the FPS. *See, e.g.*, *Technica, LLC*, B-417177 et al., 2019 WL 1514000, at *4 (Comp. Gen. Mar. 21, 2019) ("[A]n agency's conclusion that a particular past performance example is not relevant does not rise to the level of a deficiency or significant weakness, nor does such a determination constitute adverse past performance information to which the protestor has not had an opportunity to respond.").

In contrast, CEIA's past performance was exceptional, demonstrating "highly acceptable" work on three fully relevant projects, including the incumbent project with requirements "almost identical to the instant requirements." *See* AR at 727–29 ("[T]he level of performance risk associated with [CEIA's] proposal is substantially less than the level expected from a competent vendor."); AR at 742–43. CEIA also had 16 CPARS reports indicating "Satisfactory to Exceptional" work in prior federal contracts. AR at 729. CEIA's Past Performance was thus significantly superior to Garrett's; the FPS was not obligated to identify to Garrett "relative weaknesses" that simply "present[] a less desirable approach" than CEIA. *Acra*, 44 Fed. Cl. at 295. Accordingly, for this reason as well, it was permissible and fair for the FPS to refrain from discussing Past Performance during its communications with Garrett.

*Second,* while FPS was not required to discuss Garrett's Past Performance, the FPS had, in fact, already informed Garrett of concerns with its Past Performance. After the first award to

CEIA, Garrett requested from the FPS an explanation of award.  *See* AR at 851–54.  The FPS provided an explanation letter, which described "[i]n general terms, the reason(s) the offeror's proposal was not selected for award."  AR at 851.  The letter stated that for Past Performance, Garrett's projects #1 and #3 "were determined to be partially relevant, in that they fully meet scope and magnitude; however, they did not fully meet complexity."  AR at 852.  Garrett was thus on notice — even before the FPS took additional corrective action — that its Past Performance projects were only partially relevant because they did not fully meet the complexity of the Solicitation's requirements.

Indeed, in its communication to Garrett pursuant to the additional corrective action, the FPS advised that Garrett "may also wish to reference the government's brief explanation letter . . . dated February 10, 2022, for additional information about the evaluation of [Garrett's] quote," including the FPS's feedback regarding Past Performance and complexity.  AR at 935.  Garrett presumably heeded the FPS's recommendation, because in a follow-up correspondence to the FPS, a Garrett representative noted that "prior feedback" indicated that "'greater complexity' is desired with past performance."  AR at 943–44.  The Garrett representative asked "what specific criteria points of complexity are evaluators seeking as the standards for complexity," to which the contracting officer cautioned "[i]t is the vendor's responsibility to carefully review the current solicitation requirements and submit past performance projects/contracts that most closely align with the scope, magnitude, and complexity of the instant requirement."  *Id.*  Garrett was therefore aware, prior to submitting its final quote pursuant to the additional corrective action, that its Past Performance submission was lacking on complexity; yet Garrett chose not to address that aspect of its quote upon resubmission.  *See* AR at 987 (during evaluation of final quotes, TET noting "Garrett did not resubmit for Past Performance").  Although the FPS informed Garrett that its past

projects did not fully meet the Solicitation's complexity, Garrett ignored the FPS's feedback and did not improve its Past Performance submission.  Garret's complaint of unfairness rings hollow.

While it is accurate that the FPS did not expressly cite Garrett's use of subcontractors as the root of Garrett's Past Performance issue, that is of no moment here.  *See, e.g.*, Pl.'s MJAR at 19 ("The Agency had not raised [the subcontractor] concern to Garrett before.").  An agency is not required to spell out, in painstaking detail, each area of a proposal that an offeror might improve. *See Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 835 (1999) (agency "not obligated to conduct all-encompassing discussions" or "address in express detail all inferior or inadequate aspects of a proposal") (internal citations and quotations omitted).  It is "not incumbent on the government to unduly assist or 'spoon-feed' an offeror." *Cube Corp. v. United States*, 46 Fed. Cl. 368, 383 (2000).  As a sophisticated entity, Garrett was responsible for reviewing the Solicitation's requirements and demonstrating to the FPS that Garrett could best meet those requirements. Indeed, the Solicitation plainly states that an offeror's use of subcontractors in prior projects may impact the offeror's Past Performance rating.  For example, the Solicitation says "[w]here a contractor provides projects performed by . . . sub-contractor's [sic] . . . the Government will evaluate the past performance of its quoted . . . sub-contractor . . . separately and consider its findings about [the subcontractor] . . . when determining the risk associated with the quote and assigning the appropriate rating."  AR at 203.  Furthermore, the Solicitation states that a subcontractor's performance on an offeror's past project may be segregated from the offeror's performance; it warns, "The Government may decide not to attribute to the prime contractor, as an organization, the past performance of its . . . sub-contractor's [sic]." *Id.*  The Solicitation is thus clear that using subcontractors may impact an offeror's rating.  Garrett was responsible for understanding the Solicitation and drafting its Past Performance submission accordingly.  The FPS

assisted Garrett by informing Garrett that its Past Performance lacked complexity; however, the FPS was not further required to "spoon-feed" Garrett the reasons its Past Performance lacked complexity.  *See Cube Corp.*, 46 Fed. Cl. at 383.

At base, the FPS was "not obligated to provide the type of specific guidance" Garrett demands.  *WorldTravelService v. United States*, 49 Fed. Cl. 431, 439 (2001).  The FPS need only "lead[] the offerors into the areas of their proposals requiring amplification" rather than "spoon-feed an offeror as to each and every item that must be revised, added, or otherwise addressed to improve a proposal."  *Id.* at 439–40 (internal citations and quotations omitted).  The FPS satisfied its obligation to treat Garrett fairly.

iv. <u>Garrett Provides No Evidence that CEIA Knew of Garrett's Lower Price</u>

Finally, Garrett argues, without evidence, that the additional corrective action was implemented unfairly because CEIA became aware of Garrett's lower price prior to submitting its final quote.  *See* Pl.'s MJAR at 28 ("Garrett's GAO protest notified CEIA of the fact that its proposal was significantly higher than Garrett's . . . .").  Garrett's argument is dubious, based on the simple observation that CEIA did not adjust its quoted price in response to the additional corrective action.  *See* AR at 739–40 (CEIA's Amendment 0007 quote price is $5,395,130); AR at 1019–20 (CEIA's final quote, after additional corrective action, is $5,395,130).  Indeed, a challenger cannot demonstrate illicit knowledge of a competitor's pricing merely by pointing out that the winning offeror simply maintained its price during corrective action.  This Court declines to infer such pricing knowledge on gossamer evidence.  Further, even if CEIA had known of Garrett's lower price, it is difficult to understand how this prejudiced Garrett when it is undisputed that CEIA did not use this alleged knowledge to change its price to make its submission more favorable.  Garrett's response to this problematic fact is that because Garrett increased its price to

account for inflation, CEIA "effectively lower[ed] its price." Pl.'s MJAR at 29.  This argument is not convincing.  It is undisputed that CEIA did not lower its price.  *Compare* AR at 739-40 (CEIA's Amendment 007 quote price), *with* AR at 1019 (CEIA's final quote).   An offeror does not "effectively lower" their price when a competitor increases their price during corrective action. Unsurprisingly, Garrett cites no persuasive authority for its contention, and this Court can find no merit in the argument.

The foregoing analysis is largely academic, however, because, as noted, there is no evidence that CEIA knew about Garrett's lower price.  Indeed, the evidence points to the contrary. Garrett does not cite to the Administrative Record or proffer any evidence to support its position. While not dispositive, CEIA submitted a declaration from Luca Cacioli, CEIA's CEO and Director of Sales to reaffirm what the Administrative Record reflects — that CEIA had no knowledge of Garrett's lower price during the procurement process.  *See* Declaration of Luca Cacioli (ECF No. 23-1) (Cacioli Decl.) at ¶ 2.  Mr. Cacioli averred that he is "involved in almost every bid that CEIA submits, particularly those that respond to solicitations from the Federal Government."  *Id.* at ¶ 5. Mr. Cacioli further states that he "provided input on both the price and technical proposals that CEIA submitted in response to" the Solicitation "and gave final approval for these submissions." *Id.* at ¶ 6.  Mr. Cacioli stated that CEIA "never learned of Garrett's proposed price" and did not learn that Garrett's price was "significantly lower" than CEIA's "until CEIA received the redacted MJAR."  *Id.* at ¶¶ 10–11.  CEIA's CEO's sworn testimony reaffirms the lack of evidence in the Administrative Record or otherwise concerning CEIA's alleged illicit pricing knowledge.  *Id.* at ¶ 7.

Garrett asserts that Mr. Cacioli's declaration "hardly establishes that the CEIA personnel who determined CEIA's pricing were unaware of what had been revealed about Garrett's pricing."

Pl.'s Reply at 7 n.1.  But Garrett swaps the burden of proof.  It is Garrett's burden to prove that it was unfairly prejudiced by CEIA's knowledge of Garrett's pricing.  It is *not* CEIA's burden to disprove Garrett's speculation that someone — anyone — at CEIA knew Garrett's pricing.  *See Bannum*, 404 F.3d at 1355–57.  It remains undisputed that Garrett failed to present any evidence that CEIA knew about Garrett's pricing.  It is evident that Garrett's argument is based on mere speculation.

Accordingly, for the reasons explained above, FPS implemented the additional corrective action fairly.  The FPS treated Garrett and CEIA fairly, and did not provide CEIA with a competitive advantage during the procurement process.

## II.       The FPS's Substantive Evaluations of Garrett's and CEIA's Final Quotes

Garrett next argues the FPS's substantive evaluation of Garrett's and CEIA's final quotes was arbitrary and capricious.  Garrett alleges (1) the FPS's evaluation and rating of Garrett's Past Performance was improper, *see* Pl.'s MJAR at 29–30; (2) the FPS's evaluation and rating of Garrett's Management Approach was improper, *see id.* at 30–32; and (3) the FPS's best value determination was flawed, *see id.* at 32–33.  For the reasons explained below, this Court largely disagrees and rejects Garrett's arguments.  This Court holds that, with one exception, the FPS's evaluation of Garrett's and CEIA's final quotes, including its best value analysis, was proper and not arbitrary and capricious.

### A.       The FPS's Past Performance Evaluation Was Not Arbitrary and Capricious

Garrett first argues the FPS's "criticism of Garrett's Past Performance is unreasonable." Pl.'s MJAR at 29.  Garrett claims the FPS's concern with Garrett's past use of subcontractors "is inconsistent with the criteria set forth" in the Solicitation, which "did not limit the amount of subcontracting the contractor will be permitted nor indicate that the use of subcontractors would

be considered, favorably or unfavorably." *Id.* at 30.   Therefore, Garrett says, "[t]he alleged weaknesses in Garrett's Relevant Past Performance are unreasonable and unfounded." *Id.*   The Government emphasizes "the highly deferential standard [used] to determine whether an agency's evaluation of past performance was reasonable" and argues "FPS's evaluation of Garrett's Past Performance was entirely reasonable, and in accordance with the terms of the Solicitation."   Def.'s Cross-MJAR at 40; *see generally id.* at 37–40.

Garrett's challenge to the FPS's Past Performance evaluation faces a steep, uphill climb. "Agency past performance evaluations are entitled to 'the greatest deference possible.'"   *Alisud-Gesac Handling – Servisair 2 Scarl v. United States*, 161 Fed. Cl. 655, 668 (2022) (quoting *Gulf Grp. Inc v. United States*, 61 Fed. Cl. 338, 351 (2004), *abrogated in part on other grounds recognized by Telos Corp. v. United States*, 129 Fed. Cl. 573, 576 n.2 (2016)); *see also Glenn Def. Marine*, 720 F.3d at 909 (agencies have "broad discretion" to measure and evaluate an offeror's past performance).   An agency's evaluation of an offeror's past performance "often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to [such] determinations."   *Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 395 (2005); *see also E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (courts should not second guess "discretionary determinations of procurement officials" that "deal with the minutiae of the procurement process in such matters as technical ratings").   A court's review of an agency's past performance evaluation should thus be limited to ensuring the evaluation was reasonable and consistent with the stated evaluation criteria.   *See Am. Auto Logistics, LP v. United States*, 117 Fed. Cl. 137, 185–86 (2014).

The FPS's evaluation of Garrett's Past Performance was reasonable.   The TET determined Garrett's first past project was not relevant regarding complexity because "there is limited

information" regarding Garrett's role in the "actual life maintenance of the machines."  AR at 989.

Rather, "the information provided only display[ed] that Garrett manufactured the machines with

no other supplemental actions."  *Id.*  The TET likewise determined Garrett's third past project was

not relevant regarding complexity because Garrett ████████████████████████████████

████████████████████████████████████████████  AR at 990.  Garrett's third project also

did not demonstrate ████████████████████  *Id.*  The TET therefore concluded there was "some

performance risk" because Garrett did not demonstrate its ability to manage the complexity of the

Solicitation, including "delivery, maintenance, training, warranties, [and] geographic dispersion."

AR at 991.  The contracting officer concurred, deciding CEIA's Past Performance was superior to

Garrett's "due to multiple factors" including "successful performance on more relevant contracts"

and "more visibility of the vendors [sic] performance on the ancillary services" required under the

Solicitation.  AR at 1021.  This is a reasonable conclusion based on a straightforward review of

Garrett's quote, and this Court will not second-guess the FPS's decision.  *See E.W. Bliss*, 77 F.3d

at 449; *see also Bowman Transp.*, 419 U.S. at 285 ("The court is not empowered to substitute its

judgment for that of the agency.").  Indeed, Garrett never disputes the facts underlying the FPS's

determination that Garrett's past performance projects were not relevant as to complexity.  *See,*

*e.g.*, Pl.'s MJAR at 29–30; Pl.'s Reply at 13–14.  Garrett simply argues the FPS's evaluation was

"unreasonable," without disputing the substance of the FPS's findings.

Garrett's primary argument is that the FPS applied an unstated evaluation criterion when

the FPS considered Garrett's past use of subcontractors.  *See* Pl.'s MJAR at 30 ("The [Solicitation]

did not indicate that subcontracting was relevant in any way to the evaluation of proposals.").  To

the contrary, the FPS's evaluation of Garrett's Past Performance complied in full with the

Solicitation's requirements.  As noted above, the Solicitation clearly explained that subcontractor

usage may impact an offeror's Past Performance rating.  *See supra* Discussion Section I.B.iii.

Describing the Past Performance evaluation factor, the Solicitation states the information each

offeror provides, including past performance projects, "will assist the Government in determining

the degree of risk associated with award of this project to the Vendor in question based [on] *that*

*Vendor's* past and present performance on other projects."  AR at 203 (emphasis added).  The

Solicitation reflects that the agency would review the *offeror's* past performance of tasks, which

the offeror would be expected to manage under the Solicitation. AR at 202-03.  Tasks performed

by another entity — such as a subcontractor — are not the offeror's past performance and do not

demonstrate the offeror's ability to manage those tasks.

        The Solicitation is explicit about its treatment of subcontractors in past performance

projects.  It states that "[w]here a contractor provides projects performed by . . . sub-contractor's

[sic] . . . the Government will evaluate the past performance of its quoted . . . sub-contractor . . .

separately and consider its findings about [the subcontractor] . . . when determining the risk

associated with the quote and assigning the appropriate rating."  AR at 203.  This is an express

disclaimer that the FPS may assess the offeror's performance in a prior project separately from the

subcontractor's performance.  The Solicitation further warns that "[t]he Government may decide

not to attribute to the prime contractor, as an organization, the past performance of its"

subcontractors."  *Id.*  This is precisely the tack the FPS took when evaluating Garrett's quote.

Garrett ███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████  *See* AR at 988–91.  The FPS

could not "identify which portion of work was performed by subs and which work was

accomplished by Garrett itself" and opted "not to attribute to [Garrett] the past performance of its"

subcontractors.  AR at 991.  As noted, the agency was permitted to make this consideration under the Solicitation.  The FPS therefore did not unreasonably apply an unstated evaluation criterion. Garrett is simply incorrect to suggest "[b]idders were not put 'on notice' of the significant consequences of submitting past projects ███████████████████████ Pl.'s Reply at 14.

Garrett finally argues its proposal "did not state that it would not use subcontractors."  Pl.'s MJAR at 30.  According to this argument, the FPS should have evaluated Garrett's quote under the assumption that Garrett *could* decide to employ subcontractors; Garrett claims its quote "left open the *possibility* that it would use subcontractors as necessary."  *Id.* (emphasis added).  This argument is unconvincing.  Indeed, it would be nearly impossible for an agency to evaluate the past performance under such a hypothetical.  The FPS evaluated the quote before it, and Garrett had "the responsibility to submit a well-written proposal with adequately detailed information that allows for meaningful review."  *KSC Boss All., LLC v. United States*, 142 Fed. Cl. 368, 382 (quoting *Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States*, 89 Fed. Cl. 735, 744 (2009)).  Garrett's quote did not ██████████████████████████████ ██████████████████████████████ under the Solicitation. AR at 991.  It was therefore proper for the FPS to evaluate Garrett's quote as though Garrett had proposed to complete the entire project on its own.

Accordingly, the FPS's evaluation of Garrett's Past Performance was not arbitrary and capricious.  The FPS's evaluation was reasonable and did not rely on unstated evaluation criteria. Garrett's arguments to the contrary are unconvincing.

### B. Although the FPS Erred in Evaluating Garrett's Management Approach, the Majority of the FPS's Evaluation Was Proper

Garrett next argues the FPS erred in its evaluation of Garrett's Management Approach. Garrett makes three arguments: (1) the FPS improperly assigned Garrett a weakness for not

conforming to the Solicitation's definition of normal business hours; (2) the FPS improperly assigned Garrett a weakness for not certifying Garrett would replace defective metal detectors within three days; and (3) the FPS "improperly credited form over substance" by awarding CEIA a strength for CEIA's ██████████████████ while refusing to award Garrett a strength for Garrett's ████████████████████, which Garrett contends was substantively identical to CEIA's ██████████████. *See* Pl.'s MJAR at 30–32; *see also* Pl.'s Reply at 14–17.

This Court agrees with Garrett that the FPS improperly assigned Garrett a weakness related to Garrett's normal business hours.  However, the FPS did not err in assigning Garrett a weakness for not complying with the Solicitation's three-day downtime requirement; nor did the FPS improperly differentiate between CEIA's ██████████████████ and ██████████████ ██████.

i.  The FPS Erred by Assigning Garrett a Weakness for Garrett's Normal Business Hours

Garrett first argues the FPS erred by assigning Garrett a weakness related to Garrett's normal business hours.  *See* Pl.'s MJAR at 30–32; Pl.'s Reply at 15–16.  As discussed above, Garrett's final quote included a revised Management Approach.  *See* AR at 987 (TET confirming "Garrett resubmitted its . . . Management Approach (Factor #3) as part of [its] final technical quotation revisions").    In reviewing Garrett's revisions to its Management Approach, the contracting officer relied on the findings included in the TET's Evaluation Report.  AR at 1020–23 ("I considered all aspects of past performance and management approach by Garrett and CEIA, including all strengths and weaknesses, as described in detail in the TET report . . . ."); *see also* AR at 982–1004.  In its report, the TET assigned Garrett's revised Management Approach a weakness related to Garrett's proposed normal business hours.  AR at 993 (citing Scope of Work,

Section XXI, para. B).  The Solicitation defined normal business hours as "8am–4:30pm locally." *Id.*; *see* AR at 89 ("The Contractor must deliver and install WTMDs between the business hours of 8:00 a.m. and 4:30 p.m. (local time), Monday through Friday, Federal holidays excluded."). The TET observed that Garrett proposed normal business hours of "8am–11pm CST."  AR at 993. "While the number of hours proposed exceeds the [Solicitation's] requirement, multiple time zones are included within the requirement;" therefore, the TET concluded based on Garrett's normal business hours, "coverage is not available for a short period."  *Id.*  For example, according to the Government, 8:00 a.m. EST/7 a.m. CST would fall within normal business hours under the Solicitation's definition, but would fall outside Garrett's normal business hours.  This lack of coverage "was considered a weakness to the TET," and accordingly, to the contracting officer.  *Id.*; AR at 1020–23.

However, the TET and contracting officer erred in assigning Garrett a weakness based on normal business hours.  Relevant here is the Scope of Work provision in the Solicitation, Section XXI, paragraph B, which states that "[t]he Contractor must deliver and install [walk through metal detectors] between the business hours of 8:00 a.m. and 4:30 p.m. (local time), Monday through Friday, Federal holidays excluded."  *See* AR at 89 (Scope of Work, Section XXI, para. B).  This provision simply requires that the contractor deliver and install walk through metal detectors between 8:00 a.m. and 4:30 p.m. local time.  Contrary to the TET's and contracting officer's finding, Garrett's updated Management Approach indicated it would comply with that requirement.  Garrett committed to "repairs 8am – 4:30 p.m. local times."  AR at 955.  Although this commitment related to "repairs" rather than delivery and installation, Garrett included the commitment within a section titled "SOW XXI," which covers delivery and installation.  *See id.*; *see also* AR at 88–89 (Solicitation's Scope of Work, Section XXI, including "Delivery and

Installation" requirements).  In other words, in the section of Garrett's updated Management

Approach addressing delivery and installation, Garrett committed to working during the hours of

8 a.m. and 4:30 p.m. local time.  This suggests Garrett would comply with the required delivery

and installation hours.  Indeed, it would be odd for Garrett to commit to repairing walk through

metal detectors between 8:00 a.m. and 4:30 p.m. local times, but not commit to delivering and

installing metal detectors during that same period.

The TET nonetheless assigned a weakness to Garrett's Management Approach based on

Garrett's proposed normal business hours, and the contracting officer erroneously relied on this

evaluation in rendering her award decision.  The error stems from a misreading of Garrett's quote.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████  The TET and

contracting officer mistakenly read Garrett's phone support availability as limiting Garrett's

commitment to deliver and install walk through metal detectors between 8:00 a.m. and 4:30 p.m.

local time.  Garrett did no such thing; Garrett's Management Approach simply committed to

providing phone support between 8:00 a.m. and 11:00 p.m. CST, *on top of* its commitment to

repair walk through metal detectors between 8:00 a.m. and 4:30 p.m. local time.  Nothing in

Garrett's quote reflects that Garrett would not meet the Solicitation's requirement to deliver and

install walk through metal detectors between 8:00 a.m. and 4:30 p.m. local time.  In contrast,

Garrett's quote did, in fact, indicate it would comply with this requirement.  *See* AR at 955.

Furthermore, to the extent the agency believed Garrett's business hours might create a scenario

where phone support "coverage is not available," Garrett's final quote committed to ████████

████████████████████████████████████████████████████ AR at 959.

Because the contracting officer relied on the TET's erroneous understanding of Garrett's quote, there was no rational basis for her to conclude Garrett's Management Approach lacked phone support coverage for certain time zones.  Thus, the assigned weakness relating to normal business hours was made in error and lacked a rational basis.

      ii.    **The FPS Did Not Err by Assigning Garrett a Weakness for Walk Through Metal Detector Downtime**

Garrett disputes another weakness the FPS assigned to Garrett's updated Management Approach associated with walk through metal detector downtime.  *See* Pl.'s MJAR at 30–31; Pl.'s Reply at 14–15.  Once again, the contracting officer relied on the TET's Evaluation Report in assessing this aspect of Garrett's Management Approach.  *See* AR at 1020–23; *see also* AR at 982–1004.  The TET's Evaluation Report noted that ██████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████  AR at 992; *see also* AR at 955.  The TET, and accordingly the contracting officer, found that Garrett's proposed walk through metal detector downtime violated the Solicitation's requirement that "downtime is no longer than 3 business days for all locations."  AR at 992, 1021–23; *see also* AR at 90 ("The Contractor must deliver and install a replacement WTMD within 3 business days after the replacement determination and written request provided by the Contracting Officer to the contractor's customer service representative.").  The TET stated that under Garrett's plan, "CONUS and OCONUS deliveries of replacement are in jeopardy of having an unacceptable amount of downtime for the [walk through metal detectors]," which might affect building security.  AR at 992; *see also* AR at 1022–23 (contracting officer noting that the TET's identified weakness in Garrett's downtime contributed to her determination that CEIA's quote "provided a level of technical superiority").

As explained further, the TET's and contracting officer's interpretation of Garrett's quote is reasonable, and, accordingly, the contracting officer did not err in assigning Garrett's Management Approach a weakness related to metal detector downtime.  Garrett's quote plainly states that ████████████████████████████████████████████████████████ ████████████████████████████████████████████ AR at 955.  The Solicitation requires that the contractor "must deliver and install a replacement [walk through metal detector] within 3 business days."  AR at 90.  Garrett's quote did not meet this requirement.  The contracting officer concurred with the TET's assessment of Garrett's quote and ████████ ████████████████████████████████████ AR at 1023.  The FPS therefore reasonably assigned Garrett a weakness.  Under these circumstances, this Court declines to disturb the FPS's conclusion or substitute its judgment for the agency's here, particularly given "the greatest deference possible" courts give to an agency's evaluation of proposals for their technical quality.  *KSC Boss All.*, 142 Fed. Cl. at 380; *E.W. Bliss*, 77 F.3d at 449 (noting that "matters [such as] technical ratings" involve "discretionary determinations of procurement officials that a court will not second guess").

Garrett makes several arguments in support of its position.  The Court finds each unpersuasive.  *First*, Garrett argues the TET and contracting officer again misinterpreted its quote.  *See* Pl.'s MJAR at 31.  Garrett claims the "FPS improperly considered Garrett's downtime thresholds for on-site repairs . . . to define Garrett's commitment to shipping replacement units."  *Id.*  In essence, Garrett argues its quote's reference to ████████████████████████████ ████████████████████████████████ applies only to instances when Garrett is repairing walk through metal detectors at the FPS locations and *does not* apply to Garrett's commitment to deliver and install replacement units.  *Id.*  Garrett's argument is not

convincing.  It is not clear from the face of Garrett's quote that its proposed unacceptable downtime relates only to on-site repairs, rather than to delivering and installing replacement units.  The onus was on Garrett to "submit a well-written proposal with adequately detailed information;" ambiguities in Garrett's Management Approach are Garrett's fault alone.  *KSC Boss All.*, 142 Fed. Cl. at 382 (quoting *Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture*, 89 Fed. Cl. at 744).  Again, in this circumstance, this Court declines to "second guess" the FPS's findings relating to "the minutiae of the procurement process."  *E.W. Bliss*, 77 F.3d at 449.

      *Second*, Garrett further argues its "initial proposal" — submitted prior to Amendment 0007 — "indicated its commitment to comply with the 3-day requirement for warranty replacement units."  Pl.'s Reply at 14–15; *see also* Pl.'s MJAR at 30–31.  Garrett contends that "[n]owhere in [its] revised proposal did it rescind its commitment to comply with" the 3-day requirement.  Pl.'s Reply at 15.  This is a red herring.  Garrett ignores that in response to Amendment 0007, offerors were required to "resubmit their response to . . . Technical Factor 3 — Management Approach, should they want to be further considered for award."  AR at 200, 204.  Garrett's Amendment 0007 quote therefore superseded its initial, pre-Amendment 0007 quote.  Indeed, Garrett has not pointed to any authority suggesting the FPS was required to consider Garrett's pre-Amendment 0007 quote.[18]  Instead, Garrett references the FPS's statement that Garrett "may at [its] discretion re-submit some or all of [its] quotation," suggesting the FPS intended to incorporate prior quotes.  AR at 935; *see* Pl.'s Reply at 15.  That statement, however, was made during additional corrective action when the FPS was seeking revisions to the offerors' Amendment 0007 quotes.  AR at 935.

---

[18] Indeed, if the FPS were required to examine offerors' initial, pre-Amendment 0007 quotes, then CEIA's Amendment 0007 quote's Technical Approach should not have been deemed Unacceptable, since its initial quote confirmed CEIA's equipment had complied with all technical requirements.  *See* AR at 412–33.  But, like the Management Approach factor, each offeror was required to "resubmit under Factor 1, Technical Approach."  AR at 204; *see also id.* at 200.

The "quotation" that could be updated in whole or in part was clearly Garrett's Amendment 0007 quote, not its initial, pre-Amendment 0007 quote.  This statement by the FPS therefore does not imply the FPS intended to incorporate Garrett's pre-Amendment 0007 quote into its final quote.

In sum, Garrett's arguments have no merit.  Garrett had "the responsibility to submit a well-written proposal with adequately detailed information that allows for meaningful review by the procuring agency."  *KSC Boss All.*, 142 Fed. Cl. at 382 (quoting *Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture*, 89 Fed. Cl. at 744).  The FPS was not required to cobble together Garrett's scattered commitments across multiple quotes to confirm Garrett's compliance with the Solicitation's requirements.  Accordingly, the contracting officer did not err in assigning Garrett a weakness for failing to comply with the 3-day downtime requirement.  AR at 1020-23.

> ### iii.   The FPS Did Not Err by Not Assigning Garrett a Strength for its █████

Garrett's final argument is that the FPS erred by not assigning Garrett's Management Approach a strength for its ██████████████████████, when the FPS assigned CEIA's Management Approach a strength for its ██████████████.  *See* Pl.'s MJAR at 32; Pl.'s Reply at 16–17.  Garrett argues the FPS "improperly credited form over substance" when it gave CEIA a strength for its ██████████████ and withheld a strength from Garrett for its "markedly similar in substance" ██████████████.  Pl.'s MJAR at 32.

Garrett essentially makes a disparate evaluation claim — that is, that the FPS inconsistently evaluated identical aspects of CEIA's and Garrett's quotes.  To prevail on a disparate evaluation allegation, Garrett "must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals."  *Off. Design Grp.*, 951 F.3d at 1372.  This standard also applies if the agency

unreasonably assigns a strength to only one proposal, despite other proposals being "substantively indistinguishable," but failing to merit a strength. *See Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 289–91 (2022) ("[T]he inquiry on a disparate evaluation claim is the same whether the disparate evaluation involves a strength, weakness, or deficiency . . . ."). The question before this Court, therefore, is whether CEIA's ████████████, which received a strength, is "substantively indistinguishable" from Garrett's ████████████, which did not receive a strength. If it is, then the FPS's evaluation was arbitrary and capricious.

On initial examination, CEIA's ████████████ and Garrett's ████████ ████ share some substantive overlap. *Compare* AR at 676 (████████████), *with* AR at 959 (████████). Each submission outlines ████████████ ████████████. *Id.* Each submission begins with ████████████ ████████ and walks through ████████████, including ████████ ████████████████████████████ ████. *Id.*

Nonetheless, CEIA's ████████████ is not "substantively indistinguishable" from Garrett's ████████. For one, CEIA's ████████████ ████████████████████. *See* AR at 676 (noting ████████████████). Garrett's ████████ ████████████████████ ████████████ AR at 959. Garrett's ████████████ leaves some ambiguity regarding how ████████████. One may potentially infer ██ ████████████████████ ████████████████. For example, it is not clear

from Garrett's quote whether the ███████████ will result in ███████████; or whether the

FPS must ████████████████████████████████. This uncertainty is not present in

CEIA's ████████████████████.

Furthermore, clarity and certainty are strengths in their own right.  As the TET observed,

CEIA's ████████████████████

 was   detailed   and   provided   a   clear   description   of   ████████████████████

AR at 999.  In her Award Decision Memorandum, the contracting officer considered the TET's

analysis of the ████████ when she compared CEIA's and Garrett's Management Approaches.

AR 1020–23.  The TET and contracting officer both valued the clarity of CEIA's ███████████

██████.  The agency has experience in working with vendors to fix defective equipment and is

in the best position to appreciate the clarity and certainty provided by CEIA through its ██████

████████████.  This Court is not inclined to overrule the findings of the agency and improperly

substitute its judgment for the agency's.  Indeed, "[w]hen a court is not convinced that the aspects

of the proposals brought to its attention are indistinguishable for the purposes of the evaluation,

then the exercise crosses the line and involves the second guessing of 'minutiae' which we are not

allowed to undertake."  *Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 588

(2017) (quoting *E.W. Bliss*, 77 F.3d at 449); *see also KSC Boss All.*, 142 Fed. Cl. at 380–81 ("It is

well established that the evaluation of proposals for their technical quality generally requires the

special expertise of procurement officials.  Reviewing courts therefore give the greatest deference

possible to these determinations."); *Off. Design Grp.*, 951 F.3d at 1373 (emphasizing it "is not the

court's role" to "second-guess the agency's discretionary determinations underlying its technical ratings").

Accordingly, the FPS did not conduct a disparate evaluation by awarding a strength to CEIA's ████████████████████ and not awarding a strength to Garrett's ████████████ ████████████.

## C.   The FPS's Best Value Determination Was Not Arbitrary and Capricious

Garrett's final complaint with the FPS's substantive evaluations addresses the contracting officer's best value determination.  Garrett claims its "lower pricing and better value should have led the FPS to grant the Contract to Garrett."  Pl.'s MJAR at 33.  Garrett further argues the FPS "failed to meaningfully account for Garrett's cost saving" and that "any purported advantages [with CEIA's quote] do not exist, or in the very least are too minor to warrant such a cost."  *Id.* The Government disagrees, claiming the "FPS's best value tradeoff analysis was conducted in accordance with the stated evaluation criteria, and reasonably supported its decision to pay a price premium to CEIA for its technically superior quote."  Def.'s Cross-MJAR at 46.

An agency's award decision is "least vulnerable to challenge when based upon a best value determination."  *PlanetSpace Inc. v. United States*, 96 Fed. Cl. 119, 125 (2010) (citing *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004)).  "Procurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss*, 77 F.3d at 449; *see also Banknote Corp.*, 365 F.3d at 1355–56 ("[C]ontracting Officers have a great deal of discretion in making contract award decisions, particularly when . . . the contract is to be awarded to the bidder or bidders that will provide the agency with the best value."). Accordingly, "a best-value determination should not be disturbed so long as the agency documents

its final award decision and includes a reason for any business judgments and tradeoffs made." *Vertex AeroSpace, LLC v. United States*, 142 Fed. Cl. 755, 776 (2019).

CEIA's final proposed price was $5,395,130 — about ███████████ than Garrett's final proposed price of ██████████. *See* AR at 1020, 1022. As the quoted prices reflected a five-year contract term, CEIA's quote was approximately ████████████████ per year than Garrett's quote. *Id.* In her award decision, the contracting officer noted CEIA's "proposed price is considered to be fair and reasonable." AR at 1020. However, because of the difference in cost, the contracting officer conducted a "price/technical tradeoff analysis to determine whether CEIA's quote provides non-price benefits that would justify paying the █████ annual price premium associated with [CEIA's] quotation." AR at 1022.

The contracting officer provided a detailed analysis describing why CEIA's quote "is a better value to the Government" than Garrett's quote. AR at 1022. She noted that CEIA's quote was superior to Garrett's for both technical evaluation factors #2 (Past Performance) and #3 (Management Approach); CEIA's quote "demonstrates relevant and high-quality past performance as well as an effective, comprehensive, and detailed Management Approach plan." *Id.* The contracting officer said "there is less risk associated with the fully relevant and high quality" Past Performance of CEIA, and CEIA's Management Approach "provides a level of technical superiority which is superior to any benefits associated with" Garrett's lower-priced quote. *Id.*

The contracting officer continued: "Specifically differentiating CEIA's quote from Garrett's quote was an overall understanding of the complexity of the requirements." AR at 1023. CEIA's highly relevant past performance and excellent Management Approach evidenced "experience with risks associated with ████████████ in working [walk through metal

detectors].” *Id.* This was important to the contracting officer, as metal detectors are “a crucial supply to maintain the FPS’s security mission.” *Id.* “Security breaches or lapses” due to defective walk through metal detectors “could be catastrophic, and it is of utmost importance to the security mission to always have working countermeasures in place.” *Id.* In sum, CEIA’s quote demonstrated CEIA’s ability to competently manage the FPS’s needs with the least amount of risk. In contrast, Garrett’s quote, including Garrett’s past performance, “demonstrated less experience with the management of geographically dispersed locations which include continued service calls and maintenance for machines.” *Id.* Additionally, the contracting officer stated that Garrett’s “timeframes associated with replacement machines was the largest concern identified by the TET.” *Id.* The contracting officer also noted that Garrett’s failure to comply with the Solicitation’s three-day replacement requirement “may cause risk of downtime at Federal Buildings . . . demonstrating the vendor may not understand the critical nature of these complexities.” *Id.* Accordingly, the contracting officer concluded CEIA’s superior quote “more than offsets” the roughly ████ price premium attached to its quote. *Id.* CEIA’s price premium “reflect[ed] a superior understanding” of the FPS’s security mission. *Id.*

As reflected by the contracting officer’s thorough best value analysis, the FPS adequately documented its decision to pay CEIA’s price premium. AR at 1020–23. The contracting officer also detailed the relevant tradeoffs and why the FPS opted to pay CEIA’s price premium. *Id.* Though awarding the Solicitation to Garrett would save the FPS about █████ annually, the contracting officer concluded CEIA’s superior understanding of the Solicitation’s complexities and the lower risk associated with CEIA’s proposal made CEIA the appropriate awardee. AR at 1022–23. In light of such a well-reasoned best value analysis, this Court opts to respect the “substantial discretion” afforded to contracting officers to make best value determinations. *E.W.*

*Bliss*, 77 F.3d at 449.  The FPS's best value determination was thorough, considered, and reasonable, and was not arbitrary or capricious.

The contracting officer's best value analysis, however, is slightly complicated by this Court's determination that the FPS erred by assigning a weakness for Garrett's normal business hours.  *See supra* Discussion Section II.B.i.  The FPS should not have assigned Garrett a second weakness in Garrett's Management Approach.  Accordingly, this Court must assess whether Garrett was prejudiced by the error.

### III.        Garrett Is Not Prejudiced by the FPS's Minor Evaluation Error

The first step of a court's review of an agency procurement considers whether the agency's conduct was arbitrary and capricious.  *See Off. Design Grp.*, 951 F.3d at 1371.  This Court found that the FPS made such an error in one instance: assigning a weakness to Garrett's Management Approach regarding normal business hours.  This Court must now proceed to the second step of the analysis, which considers whether the agency's error prejudiced the protestor.  *Id.*  A protestor can establish prejudice only if it can demonstrate there was a "substantial chance" it would have received the contract but for the error.  *See Bannum*, 404 F.3d at 1353; *see also Off. Design Grp.*, 951 F.3d at 1374–75; *Glenn Def. Marine*, 720 F.3d at 907 ("*De minimis* errors in the procurement process do not justify relief.").  The burden to prove prejudice lies with the protestor.  *See Sys. Studs. & Simulation*, 22 F.4th at 996–97.

Garrett must therefore demonstrate that but for the FPS's error, Garrett would have had a "substantial chance" to win the Contract.  As an initial matter, it is important to be clear what the FPS's arbitrary and capricious error was.  The *only* such error the FPS committed was in assigning Garrett's Management Approach a weakness regarding normal business hours.  *See* AR at 993 (Garrett's normal business hours of 8:00 a.m. to 11 p.m. CST "was considered a weakness to the

TET"); AR at 1021–22.  As previously discussed, the FPS did not err by implementing additional

corrective action; nor did the FPS err by implementing the additional corrective action unfairly.

The FPS likewise did not err in its evaluation of Garrett's Past Performance.  And the FPS did not

err in evaluating CEIA's final proposal, including assigning CEIA a strength for its ██████████

████████████.  The question, then, is whether Garrett would have had a substantial chance to

receive the Contract if the FPS had not assigned a second weakness to Garrett's Management

Approach.  If Garrett would have had a substantial chance at award under this circumstance, then

it is prejudiced.

Garrett has not met its burden.  The FPS's evaluation error was harmless and did not

prejudice Garrett.  The Federal Circuit has confirmed an agency's evaluation error may not be

prejudicial, including in best value procurements.  *See, e.g.*, *Off. Design Grp.*, 951 F.3d at 1373–

74 (finding no prejudice despite disparate treatment by agency).  For example, in *WellPoint Mil.*

*Care Corp. v. United States*, the Federal Circuit held the protestor suffered no prejudice even where

the agency had committed procurement errors.  953 F.3d 1373, 1381–82 (Fed. Cir. 2020).  Under

the relevant solicitation, "non-price [evaluation] factors . . . [were] significantly more important"

than the price factor.  *Id.* at 1381.  In addition, the first two technical subfactors were "more

importan[t]" than the third technical subfactor.  *Id.* at 1381–82 (alteration in original).  The Federal

Circuit concluded the awardee's proposal was superior to the protestor's proposal for the first two

technical subfactors.  *Id.* at 1382 (noting the agency characterized awardee's proposal as a

"thorough approach" that offered "a clear competitive advantage," as well as "significant

experience").  Even if the agency had erred in evaluating the third factor, the error was harmless

because the awardee's proposal was significantly superior to the protestor's, particularly for the

first two, more important subfactors.  *Id.*  (Court of Federal Claims did not err "when it concluded

[protestor] would not have had a 'substantial chance' of winning the contract . . . even if [protestor] had been rated higher under the [third] subfactor").

That is the case here.  The Solicitation clearly stated that the Past Performance factor was more important than the Management Approach factor.  *See* AR at 202 ("Technical Factors #2 [Past Performance] and 3 [Management Approach] are listed in descending order of importance."). The contracting officer "determined that CEIA is superior to Garrett in Technical Factors #2 and #3, Past Performance and Management Approach."  AR at 1022.  Like the awardee's proposal in *Wellpoint*, CEIA's quote was stronger than Garrett's on the more important evaluation factor, Past Performance.  *See Wellpoint*, 953 F.3d at 1381–82.  CEIA's Past Performance submission demonstrated "successful performance" on the incumbent project, "more examples of fully relevant past performance," and "more visibility" on "ancillary services" required under the Solicitation.  AR at 1021.  CEIA's quote was therefore stronger where it mattered most.

For Management Approach, CEIA's quote was similarly superior, with three strengths compared to Garrett's one strength and two weaknesses.  *Id.*  Even if Garrett's normal business hours weakness were eliminated, the score would still be lopsided; CEIA's Management Approach yielded three strengths compared to Garrett's one strength and one weakness.[19]  And under that scenario, Garrett's improvement relative to CEIA occurred within the less influential technical evaluation factor.  *See Wellpoint*, 953 F.3d at 1381–82.  CEIA's Past Performance, the more important technical evaluation factor, was still rated as superior to Garrett's Past Performance.  AR

---

[19] There is no basis to change Garrett's normal business hours weakness into a strength.  Garrett does not argue that its Management Approach should have been assigned a strength for its normal business hours, nor does the Administrative Record provide any evidence that a strength was warranted.  Eliminating Garrett's normal business hours weakness, therefore, neutralizes that aspect of Garrett's quote.  Garrett's final Management Approach would therefore be left with one weakness and one strength.

at 1019–20; *see Sys. Stud. & Simulation, Inc v. United States*, 152 Fed. Cl. 74, 96 (2020) (recognizing SSA "placed great emphasis" on the awardee's strengths under the "more important" first two factors). Therefore, even under this formulaic plus-minus approach to strengths and weaknesses, Garrett's improved quote is far weaker than CEIA's quote.

Simply tallying CEIA's and Garrett's strengths and weaknesses, however, does not resolve the prejudice inquiry. According to the Solicitation, the Contract would go to "the vendor that provides the best value." AR at 205. The contracting officer performed a price/technical tradeoff analysis to determine whether CEIA's superior quote was worth the higher price. *See* AR at 1022–23. The contracting officer concluded CEIA's quote was well worth the higher price, *see id.*; however, would that have still been the case if the FPS had not erred by assigning a second weakness to Garrett's Management Approach? The answer is clearly yes. The Administrative Record demonstrates the improper weakness in Garrett's Management Approach had little, if any, impact on the contracting officer's best value analysis. *See Precision Images, LLC v. United States*, 79 Fed. Cl. 598, 626 (2007) (holding "the administrative record indicates that the [agency] would have engaged in the same tradeoff and determined that [awardee] represented the best value under the terms of this solicitation even if" the agency did not commit the evaluation error). The contracting officer's technical tradeoff scarcely considered Garrett's normal business hour weakness, mentioning it only once when contrasting Garrett's Management Approach with CEIA's technically superior quote. *See* AR at 1022–23.

It is apparent from the contracting officer's best value analysis that what "specifically differentiat[ed]" CEIA's quote from Garrett's quote was CEIA's "overall understanding of the complexity of the requirements." AR at 1023. Garrett's normal business hours weakness did not factor into the contracting officer's analysis in a meaningful way; the contracting officer did not

reference that weakness when "[s]pecifically differentiating" between CEIA's and Garrett's quotes.  *See id.*  Rather, the contracting officer referenced CEIA's fully relevant past performance projects, including the incumbent project, and CEIA's Management Approach plan as evidence of CEIA's superior understanding of the Solicitation.  *See* AR at 1023; *see also LB&B Assocs., Inc. v. United States*, 160 Fed. Cl. 710, 738 (2022) (holding no prejudice, in best value procurement, because agency "based its award decision solely on [awardee's] strengths").  The contracting officer also flagged Garrett's past performance efforts, which "demonstrated less experience with the management of geographically dispersed locations" and widened the gap between CEIA's and Garrett's quote.  AR at 1023.  The contracting officer finally referenced Garrett's lacking Management Approach but addressed *only* Garrett's weakness relating to "timeframes associated with replacement machines," which was "the largest concern identified by the TET."  *Id.*; *see also* Oral Arg. Tr. at 56:21–22 (Government agreeing metal detector downtime, not normal business hours, was "certainly the contracting officer's largest concern if you look at the two weaknesses"). This weakness "may cause risk of downtime at Federal Buildings utilizing the [walk through metal detector], demonstrating [Garrett] may not understand the critical nature of these complexities under the [Solicitation]."  AR at 1023.  The normal business hours weakness assigned to Garrett's Management Approach was not mentioned by the contracting officer as something that "[s]pecifically differentiat[ed]" CEIA's quote from Garrett's quote.  AR at 1023; *see  Sys. Stud. & Simulation*, 152 Fed. Cl. at 95 ("Had the [erroneous] strength significantly impacted her analysis, one would expect to see the SSA incorporate it into her discussion of comparative proposal price. . . . This omission . . . speaks to the strength's lack of influence on the best value tradeoff."), *aff'd*, 22 F.4th 994, 998 (Fed. Cir. 2021) ("[T]he court's finding that 'loss of the [] strength would not have disturbed [awardee's] lead' was not clearly erroneous.") (second alteration in original).  That

the contracting officer did not discuss Garrett's normal business hours weakness when "specifically differentiating" between CEIA and Garrett suggests that weakness had a negligible impact on the contracting officer's best value determination.  *See* AR at 1023.

In summary, Garrett's normal business hours weakness was a minor error that would not have affected the contracting officer's best value determination here.  This Court is thus satisfied that eliminating the FPS's evaluation error would not give Garrett a "substantial chance" at receiving the Contract award.  The contracting officer's tradeoff analysis would not change even if Garrett's normal business hours weakness were removed from Garrett's rating.  For all of these reasons, accordingly, Garrett did not suffer prejudice.[20]

### IV.        Garrett Is Not Entitled to Injunctive Relief

Garrett requested injunctive relief, asking this Court to "enjoin the Agency from proceeding with the awarded contract."  Pl.'s MJAR at 34.  This Court considers four factors when deciding whether to grant injunctive relief: (1) whether the plaintiff has succeeded on the merits, (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) whether the balance of hardships to the respective parties favors granting an injunction, and (4)

---

[20] Garrett contends its ███████████████████████ is substantively identical to CEIA's ████████████ and, accordingly, should have been assigned a strength.  *See* Pl.'s MJAR at 32 ("Garrett should have also received a strength for its approach.").  The Court disagrees, as discussed above.  *See supra* Discussion Section II.B.iii.  However, even if Garrett were correct, the Court's prejudice analysis would not change.  Adding a strength to Garrett's final Management Approach — and erasing the errant normal business hours weakness — would result in two strengths and one weakness.  Garrett's Management Approach would still be considered weaker than CEIA's, which was assigned three strengths.  AR at 999.  Though Garrett's Management Approach rating is closer to CEIA's, Management Approach is still not as important as Past Performance, where CEIA's quote, according to the contracting officer, "demonstrates significantly [less] performance risk" than Garrett's quote.  AR at 1021.  Furthermore, as discussed above, Past Performance and Management Approach "are significantly more important than price."  AR at 202.  The contracting officer therefore would not have changed her price/technical tradeoff analysis based on Garrett's marginal improvements within the least important technical factor.

whether the public interest is served by granting an injunction.  *See Centech Grp.*, 554 F.3d at 1037.  This Court need not advance past the first factor.  "A plaintiff who cannot demonstrate success upon the merits cannot prevail upon a motion for injunctive relief."  *By Light Prof'l IT Servs., Inc. v. United States*, 131 Fed. Cl. 358, 367 (2017) (citing *Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd.*, 357 F.3d 1319, 1325 (Fed. Cir. 2004)); *see Obsidian Sols. Grp., LLC v. United States*, No. 2021–1836, slip op. at 10 (Fed. Cir. Dec. 8, 2022) ("There can be no injunctive relief without a corresponding prevailing claim."); *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1312 (Fed. Cir. 20007) (noting success on the merits is "the most important factor required to enjoin the award of [a] contract").  As discussed above, Garrett's protest fails on the merits.  Accordingly, Garrett is not entitled to injunctive relief.

## CONCLUSION

For the reasons set forth above, this Court **DENIES** Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 20), **GRANTS** Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 22), and **GRANTS** Intervenor-Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 23).  The Clerk of Court is **DIRECTED** to enter Judgment accordingly.  The parties are directed to **CONFER** and **FILE** a Notice within nine days of this Memorandum and Order, attaching a proposed public version of this Memorandum and Order, with any competition-sensitive or otherwise protected information redacted.

IT IS SO ORDERED.



*Eleni M. Roumel*
ELENI M. ROUMEL
Judge

December 19, 2022
Washington, D.C.